*Decision will be entered under Rule 50.*

WILKERSON DAILY CORPORATION, LTD., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 96048.   Promulgated November 22, 1940.

*A. Calder Mackay, Esq., Thomas R. Dempsey, Esq.,* and *Noel Singer, C. P. A.,* for the petitioner.
*E. A. Tonjes, Esq.,* for the respondent.

**OPINION.**

KERN: Petitioner here attacks respondent's determination of a surtax upon the taxpayer based upon section 102 (a) of the Revenue Act of 1934 [1] (48 Stat. 680, ch. 277). Respondent does not claim that the taxpayer was formed for the purpose of preventing the imposition of a surtax on its shareholders, but merely that in the taxable fiscal year of 1936 it was availed of for that purpose.

In the instant proceeding respondent relies upon subsection (b) of section 102, *supra*, which provides:

(b) PRIMA FACIE EVIDENCE.—The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to avoid surtax.

It is an admitted fact in this proceeding that gains were permitted to accumulate during the taxable year; but that they were beyond the reasonable needs of the business is contested by the taxpayer. In support of his contention on this point respondent has cited several cases, among them *Helvering* v. *National Grocery Co.*, 304 U. S. 282. In

---

[1] SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS.

(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year upon the adjusted net income of every corporation (other than a personal holding company as defined in section 351) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting gains and profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following:

(1) 25 per centum of the amount of the adjusted net income not in excess of $100,000, plus

(2) 35 per centum of the amount of the adjusted net income in excess of $100,000.

that case, in finding against the taxpayer, the Court said: "That there was no need of accumulating any part of the year's earnings for the purpose of financing the business was shown by the balance sheet."

In the instant case a balance sheet would provide no basis for adjudging the necessity of a surplus. But the Court, in the *National Grocery* case, went on to say that no conceivable expansion could have utilized so large a surplus. It is possible, however, in the instant case, that the establishment of a New York daily and an annual could have completely exhausted the surplus, but these ideas were never carried into effect and were, apparently, abandoned.

In *United States* v. *Tway Coal Sales Co.*, 75 Fed. (2d) 336, cited by the respondent, the court declared that "It is the accumulation of surplus plus its interdicted purpose that brings the statute into operation, and its size in relation to business needs is but a circumstance out of which a presumption of improper purpose arises, though such purpose may be shown by pertinent evidence with or without the presumption as an aid." This view has been accepted as correct by the Board and its application to the instant facts tests the validity of the respondent's contentions. The petitioner corporation certainly can not be judged by the same business standards as could a grocery store chain. What would clearly be an unreasonable surplus in the former case might be far from unreasonable in the latter. In *William C. de Mille Productions, Inc.*, 30 B. T. A. 826, the Board, when confronted with this question, said: "The word 'reasonable' is a relative term. What would be reasonable in one situation or for one business might be clearly unreasonable in another."

Viewing the reasonableness of petitioner's surplus in this light, and accepting as true the contention of Wilkerson, the sole witness introduced at the hearing, that petitioner's business was at best a gamble and one in which any year might bring unforeseen lack of patronage, we would then have to arrive at the conclusion that the surplus set up by the petitioner during the taxable year was not necessarily unreasonable. The purpose of accumulating the surplus was set forth by Wilkerson at the hearing and respondent introduced no witnesses to testify to the contrary.

Wilkerson testified that it was in order to avoid the effect of lockouts and to establish independent good will that he purchased the Bel Air property, where he might conduct business at the dinner table. His entry into the restaurant business, he testified, was also to enable petitioner to do business on a social basis. But, interestingly enough, the profits from the restaurants did not go to the petitioner, but to Wilkerson. It was his venture, not the petitioner's. Wilkerson testified also that he thought it would lend necessary prestige if peti-

tioner could purchase an office building of its own, which would require a large amount of capital. And, in addition to this, Wilkerson said that petitioner was also trying to garner a sufficient surplus to enable it to operate for a whole year without income in the event of disastrous boycotts. This, it was estimated, would require a reserve of at least $200,000. Further, Wilkerson said petitioner contemplated the organization of a New York corporation as a wholly owned subsidiary to publish a separate daily journal, and in 1935 passed resolutions authorizing the organization thereof. This was estimated to require an additional forty to sixty thousand dollars; and the further cost of the projected annual motion picture publication would be in the neighborhood of $60,000 per issue, according to Wilkerson.

Whether it be thought a prudent business venture to contemplate expansion or the doing of business on a large scale "front" is not for the Board to determine. It must be assumed that a business shall have the right to grow, *William C. de Mille Productions, Inc.*, *supra;* and such growth is at the discretion of the corporation. However, in our instant case there appears no rational answer to the sudden abandonment of all the allegedly contemplated expansions. Only one, the failure to build an office building, is satisfactorily explained. If petitioner actually intended the expansions set forth by Wilkerson, it is peculiar that it allowed its surplus on hand to be so diverted to the use of its sole stockholder that it could not make those expansions. Nor has it carried any of them into effect to date, except for the change in office address.

Respondent insists that further facts exist which controvert Wilkerson's statements as to the corporation's purposes and intentions. He points to the extensive borrowing of Wilkerson in the taxable year from the funds of the taxpayer. In the *National Grocery Co.* case, *supra*, the Court affirmed a principle laid down in *United Business Corporation of America*, 19 B. T. A. 809; affd., 62 Fed. (2d) 754, to the effect that certain loans were incompatible with a purpose to strengthen the financial position of the petitioner and were entirely in accord with a desire to get the equivalent of the dividends under another guise. In the *United Business Corporation* case, *supra*, money was loaned to an individual who held all the capital stock except for three qualifying shares. The Board there found as a matter of fact that the borrower was worth approximately three-quarters of a million dollars in addition to his interest in the corporation in the taxable year, and had the financial ability to meet his obligations to the corporaton. He had the use of the corporation's funds in an amount greatly in excess of its surplus and made only

a very small payment on account of interest. In the instant case, while the facts are not identical, they are, to say the least, related. The bulk of the loans to Wilkerson went for three main purposes—buying in the stock held by Sonn, financing the purchase of a private home, and paying current personal bills. Any benefit which accrued to the taxpayer from Wilkerson's uses of these funds seems in the main to be incidental. Certainly nothing was gained by the corporation by loaning money to Wilkerson to pay his personal debts. This was entirely beneficial to Wilkerson himself. Nor does the situation seem materially different in the case of the purchase of Sonn's stock. The acquisition of the stock gave an absolutely controlling hand to Wilkerson and at the same time quieted the voice of a man who was hypercritical of Wilkerson's management and financial manipulations. Sonn was never a serious threat from the standpoint of disrupting the management of the corporation. He owned too small a block of stock. The minutes of the petitioner which have been put in evidence clearly indicate that Sonn's voice was most ineffectual. Consequently, it is difficult to see how the petitioner rather than Wilkerson himself received the benefit from the purchase of Sonn's stock. As for the third item—the funds used for the purchase of the residence—undoubtedly, as Wilkerson testified, it thereby became possible to establish valuable "over the table" contacts, which may ultimately have proved beneficial to the petitioner. But it seems a strain on a practical imagination to abide by Wilkerson's statement that the only reason for the purchase of the home was as a place for business contacts. The approximate cost of the residence was $160,000, which figure seems greatly out of proportion to the expected return on such an investment, if it can be thought to have been purchased solely as a business investment, inasmuch as the continued maintenance would run to an extremely high figure. Also, there seem to have been other places in which to talk business "over the table." Wilkerson owned the Vendome and the Trocadero restaurants, which were admittedly patronized almost exclusively by the very people with whom petitioner sought to do business. The inescapable conclusion, in the eyes of the Board, is that the purchase of the residence was for the primary benefit of Wilkerson himself.

The amounts of the loans to Wilkerson are interestingly in proportion to his interest in the accumulated surplus in the years 1935 and 1936. In these years he had title to 80 percent of the outstanding stock (including the 15 shares held by the bank), and consequently, an interest in that proportion in any surplus which might be distributed in the form of dividends. The following shows the

amount of loan, the surplus accumulated, and Wilkerson's contingent 80 percent interest in that surplus for the years 1935 and 1936:

| Year ended | Loan | Accumulation | 80% interest |
|---|---|---|---|
| 7/31/35 | $18,192.12 | $22,911.25 | $18,329.00 |
| 7/31/36 | 46,025.65 | 58,442.11 | 46,953.69 |

The close similarity between what Wilkerson borrowed and what he would have received as his share of the dividends (subject, of course, to his wife's claim under their settlement agreement), while not determinative of the fact that it was Wilkerson's desire to get the equivalent of his dividends under another guise, certainly casts affirmative weight in that direction.

As respondent points out, Wilkerson actually held no bankable assets sufficient to entice a prudent disinterested corporation to make such large personal loans. If the petitioner was storing up a nest egg for future use in case of emergency, it stands to reason that it would require some form of security which could be readily liquidated. So far as the record indicates, the only security Wilkerson could offer was his interest in the two restaurants and in the private dwelling for the purchase of which he was borrowing. Wilkerson himself pointed out that the restaurants were indirectly beneficial to the business, and, consequently, it stands to reason that the corporation would be loath to see them sold. It is of no consequence that Wilkerson was willing to pay a higher rate of interest than the banks or other interested parties. In the *United Business Corporation* case, *supra*, the borrower guaranteed to pay interest. As a matter of fact, he did not currently meet those interest payments. In the instant case the most convenient method of meeting interest payments on the loan would have been for Wilkerson to award himself a greater salary in the years subsequent to 1935. And this he did; whether for this purpose or because he calculated that he actually merited such increase. The evidence shows that by March 1938 Wilkerson had fully repaid the petitioner. The evidence, moreover, clearly shows that petitioner had declared dividends between July 31, 1936, and March 1938, sufficient to aid Wilkerson materially in offsetting the amounts he still owed on those dates. Added to this factor are the salary increases Wilkerson awarded himself, by means of which he paid off the balance. The entire picture, viwed in this light, indicates that the petitioner, at Wilkerson's direction, must have forthwith abandoned any alleged beneficial purpose for the accumulation of surplus. To conclude otherwise would necessitate overlooking a material inconsistency in petitioner's management.

Following the principle announced in *United Business Corporation*, *National Grocery Co.*, and *Tway Coal Sales Co.*, *supra*, we find

that the petitioner's loans to Wilkerson did not constitute real investments by the former, and that the circumstances negative any real business purpose for the accumulation by petitioner of a surplus in the amount shown. After a careful consideration of the evidence adduced herein, we have concluded that respondent did not err in his determination that petitioner was subject to surtax under section 102 of the Revenue Act of 1934, set out above.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

ARUNDELL, MURDOCK, BLACK, and LEECH dissent.