McCutchin Drilling Company v. Commissioner.
McCutchin Drilling Co. v. Commissioner
Docket No. 110289.
United States Tax Court
1943 Tax Ct. Memo LEXIS 169; 2 T.C.M. (CCH) 554; T.C.M. (RIA) 43370; July 31, 1943
*169 Earnings accumulated to avoid surtax on shareholders. - Petitioner, a Texas corporation organized in 1935 to drill oil wells, issued all its stock to its president with the exception of two qualifying shares. Through its fiscal year ended September 30, 1940, no dividends had been declared though its surplus then exceeded $306,000. One of petitioner's principal customers was its president to whom large credits were extended in the form of cash loans, supplies and drilling services. Held, petitioner was availed of in such fiscal year for the purpose of preventing the imposition of a surtax upon its shareholders, within the meaning of section 102 of the Internal Revenue Code. Harry C. Weeks, Esq., 910 Sinclair Bldg., Fort Worth, Texas, and R. B. Cannon, Esq., 910 Sinclair Bldg., Fort Worth, Texas, for the petitioner. D. D. Smith, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: This is a proceeding to redetermine deficiencies in income tax and section 102 surtax for the fiscal year ended September 30, 1940, in the amounts of $1,323.82 and $9,933.06, respectively. Petitioner assigned two errors respecting respondent's determination of the income *170 tax deficiency. It claimed that (1) the allowance for depreciation on drilling rigs was inadequate, and (2) the respondent failed to allow the loss sustained upon the abandonment of an oil property. The first alleged error has been disposed of by stipulation that petitioner is entitled to an additional deduction for depreciation in the sum of $5,544.83. Also, the respondent has conceded the second assignment of error and petitioner is entitled to a loss deduction of $5,483.09. Effect will be given to the indicated stipulation and concession in the recomputation under Rule 50. The only question, therefore, which remains in controversy is whether petitioner was formed or availed of during the taxable year ended September 30, 1940, for the purpose of preventing the imposition of the surtax upon its shareholders, through the medium of permitting its earnings or profits to accumulate instead of being divided or distributed. The return for the period here involved was filed with the collector of internal revenue for the second collection district of Texas, at Dallas, Texas. Findings of Fact Petitioner was incorporated under the laws of Texas in October 1935. It was capitalized at $25,000 *171 represented by 250 shares of $100 par value stock, all of which, with the exception of two qualifying shares, was issued to Alex McCutchin, its president. Petitioner kept its accounts and made its income tax returns on the basis of a fiscal year ended September 30. Capitalization and stock ownership remained the same as above through the fiscal year ended September 30, 1940. Since 1930 McCutchin had been engaged in the businesses of producing oil and drilling oil and gas wells under contract. Upon the formation of petitioner, McCutchin transferred to it all his drilling rigs, equipment, trucks and incomplete drilling contracts. Thereafter, petitioner, carried on McCutchin's former business of well drilling on contract, while McCutchin continued to produce oil on his own and on leased properties, becoming one of petitioner's best customers. Petitioner charged McCutchin on the same basis as it did others and profited from its dealings with him. The cost of drilling wells on McCutchin's property was deducted by him on his individual tax returns and a portion of this cost was reported by petitioner as a part of its net income. Petitioner's contracts placed upon it the responsibility *172 of completing a producing well or of drilling until the work was abandoned as a dry hole. There existed the possibility that a well might be lost any time before completion through blow-out, fire, cratering or breakage of drilling equipment. In this event, the entire loss would, under most contracts, fall upon petitioner. Petitioner was also required to assume all liability for injuries to the public and for property damaged. McCutchin's given reason for incorporating petitioner was his desire to avoid personal liability for these possible losses though he had sustained no bad losses up to the time of petitioner's incorporation, and petitioner had suffered no loss of consequence through its fiscal year ended September 30, 1940. There have been few fires in recent years arising from oil drilling, generally, improvements in methods and fire control having greatly reduced such incidents. Cratering was not common in fields in which petitioner operated. The drilling equipment which McCutchin transferred to petitioner embraced three or four medium-light steam rigs. Petitioner's books show that McCutchin's account was credited with $7,500 for these rigs. During the fiscal year ended September *173 30, 1940, petitioner owned five rigs of which three were power driven. None of them could be employed for deep well drilling. A rig capable of drilling a deep well costs from $40,000 to $60,000 or more. The commencement of deep well drilling operations also requires cash capital equal to 50 or 75 percent of the cost of the rig. Petitioner had bid on deep well jobs but had not succeeded in securing such a contract up to the time of this proceeding. During the fiscal year ended September 30, 1940, petitioner drilled no wells deeper than 4,500 feet. A power rig becomes obsolete in two or three years and in the interim parts must be replaced. Each string of drill pipe can be used to drill only from three to five wells. It then becomes crystalized and worn and, unless discarded, may break off and cause the hole to be lost. In the vast majority of cases, petitioner drilled wells for cash. Small amounts were paid during the operations, which took from 35 to 45 days, with the balance payable from 60 to 120 days after completion. In a few instances petitioner drilled wells for oil payments extending as long as five years. A higher contract price was obtained on such contracts. The number *174 of wells drilled by petitioner for McCutchin, the number drilled for other customers and the total drilled in each year during petitioner's existence are as follows: Fiscal Year
Drilled
Ended
Drilled for
for
September 30
McCutchin
Others
Total
1936
27
45
72
1937
6
77
83
1938
14
69
83
1939
11
58
69
1940
7
35
42
1941
12
53
65
1942
3
33
36
The transaction between petitioner and McCutchin were handled somewhat differently from those with other customers. Petitioner carried on its books a "McCutchin account." The cost of wells drilled for McCutchin was debited on this account, but only three such entries were made in the fiscal year ended September 30, 1940. Of a total debit for drilling of over $73,000 more than $61,000 was entered on the last day of the fiscal year. McCutchin usually settled his account with petitioner at the end of the calendar year. Petitioner and McCutchin were in the habit of using each other's supplies, crediting or debiting the account as the case might be. In the fiscal year in question 118 of such transactions occurred, 88 of which were transfers to McCutchin. During the first three years of petitioner's existence, *175 McCutchin guaranteed petitioner's credit accounts and occasionally made cash advances to petitioner in order to help finance its operations. These advances were credited to the McCutchin account. Petitioner's principal supply house always considered itself as dealing largely with McCutchin and, in extending credit, relied as much upon his financial integrity as the petitioners' profit and loss statement. McCutchin was invariably the individual with whom it transacted business when selling to petitioner. Once petitioner had built up substantial surplus McCutchin began to borrow from it. On October 1, 1939, the first day of the fiscal year in question, McCutchin owed petitioner $91,791.30. The account was settled on December 31, 1939, but 31 days thereafter McCutchin borrowed $56000 from petitioner. McCutchin owed petitioner an amount in excess of this sum for the balance of the fiscal year ended September 30, 1940, the amount owing petitioner on the last day of the period being $120,312.97. No interest was paid on money borrowed. Petitioner received a two percent discount from the supply houses on purchases for cash and in buying for cash petitioner also could save finance and interest *176 charges. A drilling contractor needs about $20,000 to $30,000 in cash per rig to avail itself of these savings. During the fiscal year ended September 30, 1940, petitioner made purchases on credit in the amount of $297,712.87, and had an average cash balance of $14,525.60. At the end of the period it had cash on hand or in the bank of about $783.85. Other pertinent figures as reflected by petitioner's books are as follows: ASSETS
9-30-39
9-30-40
Cash
$ 2,910.34
$ 783.85
Accounts and Notes Receivable
113,057.69
246,081.72
Pipeline Runs Receivable
4,083.57
2,123.90
Oil Payments Receivable
52,811.10
26,989.49
Utility and Insurance Deposits
554.00
954.00
Oil and Gas Properties: Leasehold Costs
32,098.10
1,597.50
Leasehold Equipment
51,243.64
37,054.60
Drilling Equipment
121,649.20
116,639.41
Materials and Supplies
26,671.87
39,129.97
Autos and Trucks
15,009.75
13,473.17
Furniture and Fixtures
526.30
526.30
Real Estate and Buildings
1,407.71
Incomplete Drilling Contracts
560.61
(6,200.49) Loss
Total Assets
$422,583.68
$479,153.42
LIABILITIES
Accounts Payable
$ 3,210.17
$ 43,098.92
Pipeline Runs Payable
306.91
306.91
Federal Income Taxes Payable
9,512.48
7,996.09
Other Taxes Payable
309.65
913.93
Total Liabilities
$ 13,339.21
$ 52,315.85
Contingent Liabilities
Oil Payment Payable
19,708.65
Reserves
Reserve for Depreciation: Drilling Equipment
42,753.49
58,727.36
Lease Equipment
14,543.73
13,608.60
Autos and Trucks
7,577.66
7,501.72
Furniture and Fixtures
180.99
233.62
Total Depreciation Reserve
$ 65,055.87
$ 80,071.30
Reserve for Depletion
9,571.11
10,262.57
Credits Applied on Oil Payments
4,291.35
Reserve for Contingent Income Receivable
8,082.47
5,264.70
Capital
Capital Stock
25,000.00
25,000.00
Surplus
277,535.02
306,239.00
Total Liabilities, Reserves and Capital
$422,583.68
$479,153.42
*177 The cash, accounts and notes receivable and pipeline runs receivable were quick assets. The amount due petitioner from McCutchin for loans, supplies and drilling represented approximately one-half of the accounts receivable item. During the fiscal year ended September 30, 1940, petitioner's total income was $326,000 and its total expense $284,000, leaving net profit of $42,000 (all figures are approximations). Of this profit, $17,000 arose from a gain in the sale of real estate taken in payment for drilling. No dividend was declared from the date of petitioner's incorporation through the fiscal year ended September 30, 1940. In 1941 petitioner increased its authorized capital to $150,000, and all stock representing the increase was distributed as a stock dividend. A cash dividend of $25,000 was made at the same time. Alex McCutchin, a resident of Texas, filed his individual tax return on a calendar year basis. He and his wife each reported one-half of their community net income. This income, in the year 1940, amounted to $68,246.25, the tax on McCutchin's share being $6,898.09. The income was such as to bring it within surtax brackets. Petitioner was not a personal holding company *178 as defined in section 501 of the Internal Revenue Code or a foreign personal holding company as defined in Supplement P of the Internal Revenue Code. Opinion We are here presented with the question of whether or not petitioner was formed or availed of for the purpose of preventing the imposition of surtaxes upon its shareholders, through the medium of permitting the earnings or profits to accumulate instead of being divided or distributed. Section 102(a) of the Internal Revenue Code[1] imposes a tax upon corporations so formed or availed of. Section 102(c) of the Internal Revenue Code[2] creates a presumption of purpose to avoid surtaxes upon shareholders in instances where it appears that the corporate earnings and profits have been permitted to accumulate beyond the reasonable needs of the business. As in all cases where the Commissioner has determined a deficiency, the petitioner has the burden of going forward, the deficiency being considered prima facie correct. Welch v. Helvering, 290 U.S. 111. *179 There are numerous decisions in which prior statutes substantially the same as section 102(a), Internal Revenue Code, have been considered. Some of these cases have been cited by both petitioner and respondent to. sustain their respective positions. Previous decisions, however, are helpful only in defining the limits to which courts have gone in applying the statute and in evincing their general attitude toward this type of tax. They can serve only as guides. Each proceeding involving section 102 surtax presents its own question of fact: The purpose behind the accumulation of the corporation's earnings and profits in that particular instance. This proceeding is no exception. The ascertainment of one's purpose in doing or not doing something is, obviously, difficult. Purpose brings into play a state of mind and to determine another's state of mind we must depend, largely, upon circumstantial evidence. Actions often refute one's expression. Petitioner here contends that its purpose in accumulating profits was not to avoid surtax on its shareholders, but that such accumulation was necessary to adequately finance the business. We think the fair inferences to be drawn from petitioner's *180 activities oppose its contention. The tax imposed by section 102(a) applies separately to each taxable period. The question is whether the purpose to avoid surtax on its shareholders existed during the taxable year for which a deficiency has been determined. Corporate Investment Co., 40 B.T.A. 1156. Thus, the business practices and actions of petitioner during the years prior and subsequent to its fiscal year ended September 30, 1940, are relevant only so far as they shed light on the reasonableness of petitioner's accumulations and its purpose during that year. Charleston Lumber Co. v. United States, 20 Fed. Supp. 83. Our first inquiry concerns the reasonableness of petitioner's accumulation of surplus with regard to its business needs. It is to be noted that through its fiscal year ended September 30, 1940, petitioner had never declared a dividend. At the beginning of that fiscal year petitioner had an accumulated surplus of $277,500 (all figures given in this opinion are aproximations) and had, in addition, a depreciation reserve for drilling equipment of $42,500. At that time, petitioner was operating five rigs *181 which, with accessories, were valued at $121,600. During the fiscal year 1940 the surplus increased to $306,200 while the reserve for depreciation for drilling equipment was increased to $58,700. The value of the five rigs decreased to $116,600. In this year petitioner drilled fewer wells than in any previous year; 42 as against 69 in 1939, 83 in 1938, 83 in 1937 and 72 in 1936. Its net profit from drilling operations decreased during the fiscal year but did so only in proportion to the decrease in the number of wells completed. Ever present in drilling is the hazard that a holf might be lost through blowout, fire or breakage of equipment. It would follow, however, that the fewer holes drilled the less is the likelihood of one being lost. So we have the picture of petitioner, during the fiscal year September 30, 1940, reducing operations and the consequent need for capital to finance each contract; decreasing the possibility of loss against which, admittedly, some surplus should be preserved; maintaining its profit in proportion to the number of contracts; and increasing its reserve for the replacement of drilling equipment, but, at the same time, turning all its profits to surplus *182 account and making no dividend payments. Petitioner's course of business was one of contraction rather than expansion. This would not warrant an increase in the accumulation of profits and earnings unless it can be said that petitioner had not yet reached a point where its surplus was reasonable in relation to its liabilities and the nature of its business. Such can not be said of petitioner. At the start of the fiscal year ended September 30, 1940, petitioner had assets of $422,500 and liabilities of only $33,000. After setting aside substantial reserves for depreciation and depletion it still showed a surplus of $277,500. McCutchin was no longer guaranteeing petitioner's accounts, or loaning it money. In fact, the period had then been reached during which petitioner was extending large credits to McCutchin. From the whole record, we think it is clearly established that petitioner, at the beginning of the taxable period in question, had on hand sufficient capital to provide for the reasonable needs of the business. Therefore, it follows that the further accumulation of earnings during the fiscal year ended September 30, 1940, was beyond the reasonable needs of the business and especially *183 was that so in view of the course which the business had taken. McCutchin testified that on several occasions petitioner had bid on deep well contracts which, if they had been obtained, would have necessitated purchase of a heavier drilling rig or rigs; that such rigs cost $60,000 each; and that additional cash up to 75 percent of the cost of a rig is required to commence operations. This is a circumstance which petitioner contends proved a need for the surplus which it carried. However sincere petitioner may have been in making its bids, the fact remains that, for one reason or another, petitioner failed to secure even one such deep well contract up to the very time of this hearing, some two years after the close of the taxable year in question. However, even had deep well drilling actually been undertaken, we think petitioner's financial position was adequate therefor. Nor are we impressed with the argument that the hazards of the drilling contract business required petitioner to accumulate a surplus greater than that which it held on October 1, 1939. Without minimizing these hazards, petitioner had amply protected itself. This is especially so in view of the fact that neither *184 petitioner nor McCutchin before it had ever suffered a bad loss or sustained unusual expense from breakage or loss of drilling equipment. The rapid wear and obsolesence of equipment does not enter into the question, since petitioner had provided for this in setting up its depreciation reserves. In view of our above holding, the burden of disproving a purpose to avoid surtaxes upon its shareholders is placed upon petitioner under section 102(c), supra. We do not think the evidence overcomes the presumption. A very significant element in discovering the purpose is the use made of the corporation's surplus. Decisive factors in many decisions have been the existence of loans to the shareholders. Wilkerson Daily Corporation, Ltd., 42 B.T.A. 1266, affirmed 125 Fed. (2d) 998; Helvering v. National Grocery Co., 304 U.S. 282; United Business Corporation of America, 19 B.T.A. 809, affirmed 62 Fed. (2d) 754, J. M. Perry & Co. Inc. v. Commissioner, 120 Fed. (2d) 123; A. D. Saenger, Inc., 33 B.T.A. 135, *185 affirmed 84 Fed. (2d) 23. Cf. Dill Manufacturing Co., 39 B.T.A. 1023. This has been especially so in instances where the shareholders owned virtually all the stock of the corporation, as is the situation here. Moreover, from the vantage point of the customer or the supplier, McCutchin and petitioner were one. In the instant proceeding, McCutchin was the president and, to all intents and purposes, the sole owner of petitioner. He represented petitioner in all business transactions. Bids were submitted by McCutchin, he took part in negotiations giving rise to drilling contracts, he executed the documents in petitioner's behalf and those dealing with petitioner looked to McCutchin as principal. Furthermore, petitioner carried on the identical business with the identical equipment, allowance made for replacement, as did McCrutchin prior to petitioner's incorporation. The sole reason given by McCutchin for his decision to incorporate petitioner was the attraction of limited liability. It is clear, however, that a direct result of this action was a reduction in McCutchin's personal tax liability. This fact does not per se show *186 a purpose to avoid surtaxes, though it may be some evidence of such a purpose. No taxpayer is to be condemned for tax savings by legitimate means. However, in the instant case, the record justifies our belief that tax savings had reached the point of tax evasion by virtue of petitioner's use for the principal purpose of preventing the imposition of surtax upon McCutchin. McCutchin, in addition to holding the position of petitioner's president, also was an oil producer in his individual capacity. He engaged petitioner to drill the required wells on his leases. Petitioner charged the regular price for its work, enough to earn a profit. McCutchin deducted the full contract price as an expense and petitioner showed its profit as income. Presumably, McCutchin drilled his own wells prior to petitioner's incorporation and could only have deducted actual costs as an expense. By the creation of petitioner, McCutchin was able to shift income from himself as an individual to petitioner which, as we have seen, was nothing more than McCutchin in corporate form. Rather than distribute petitioner's earnings, which would have resulted in their taxation to McCutchin, he caused them to accumulate beyond *187 the reasonable needs of petitioner's business. On the other hand, petitioner, during the fiscal year ended September 30, 1940, went a long way toward financing McCutchin's individual oil producing operations through the extension to him of considerable credits representing cash, supplies and drilling. McCutchin paid no interest for the use of the money nor, so far as the record discloses, a finance charge for carrying the drilling contracts. Supplies were transferred to McCutchin at petitioner's cost. Obviously, petitioner derived no advantage from this use of its earnings. McCutchin had full use of petitioner's profits without the necessity of paying surtax on them. To observe the extent to which McCutchin was using petitioner's accumulations we need only to turn to petitioner's books which show that of its accounts receivable as of September 30, 1940, in the sum of $246,000, almost one-half represented money owed it by McCutchin. In a somewhat similar situation presented in the case of Helvering v. National Grocery Co., supra, the court quoted United Business Corporation of America v. Commissioner, at 62 Fed. (2d) 754, *188 wherein it was said, "These loans are incompatible with a purpose to strengthen the financial position of the petitioner, but entirely accord with a desire to get the equivalent of his dividends under another guise." The same may be said here. We conclude that petitioner was availed of during the taxable year ended September 30, 1940, for the purpose of preventing the imposition of the surtax upon its shareholders within the meaning of section 102(a), supra, through the medium of permitting its earnings or profits to accumulate instead of being divided or distributed. In view of this holding, it becames unnecessary to determine whether or not petitioner was formed for the same purpose. Decision will be entered under Rule 50. Footnotes
1. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders of the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: 25 per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus 35 per centum of the undistributed section 102↩ net income in excess of $100,000. 2. (c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.↩