HAMABE REALTY CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hamabe Realty Corp. v. Commissioner
Docket No. 6034-70.
United States Tax Court
T.C. Memo 1974-233; 1974 Tax Ct. Memo LEXIS 86; 33 T.C.M. (CCH) 1029; T.C.M. (RIA) 74233; September 9, 1974, Filed. Martin H. Bodian and Arnold M. Schotsky, for the petitioner. *88 H. Stephen Kesselman, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioner's Federal income tax for 1966 and 1967 in the respective amounts of $10,030.63 and $9,363.28. The only issue for decision is whether the petitioner is liable for the accumulated earnings tax for those years. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.
Petitioner is a New York corporation whose principal office was in New York, New York, at the time of filing the petition herein. Petitioner filed Federal income tax returns for 1966 and 1967 with the district director of internal revenue, New York, New York. During the taxable years in issue, petitioner's shareholders and their holdings were as follows: Shareholder
Number of shares owned
Fractional share of ownership Louis Etra
142-6/7
1/7
Gustave Etra
142-6/7
1/7
Max Etra
142-6/7
1/7
Harry Etra
142-6/7
1/7
Estate of Isaac Etra
142-6/7
1/7
Max J. Etra (son of Israel Etra)
142-6/7
1/7
Estate of William Etra, Trust F/B/O Rose Etra
47-9/21
1/21
Harvey Etra
31-17/21
2/63
Marvin Etra
31-17/21
2/63
Bernard Etra 31-17/21
2/63
1,000
100%
*89 Petitioner was organized in 1940 by the seven Etra brothers for the purpose of constructing a building and leasing it to The Great Atlantic & Pacific Tea Company, Inc. (A&P). In that year, petitioner acquired unimproved land at 52-11 Grand Avenue, Maspeth, Queens, New York, and constructed thereon a food storage and processing plant, known as the Brooklyn Produce Warehouse, according to A&P's specifications. A&P has since been the sole tenant of such building under successive leases from the petitioner. The Brooklyn Produce Warehouse was constructed in four sections to accomodate A&P's specific needs at the time. The first section was designed for the storage and processing of bananas and contained five banana-gassing chambers.The second section was a warehouse for produce and canned goods and contained two large cold-storage lockers. The third section was designed for the storage and processing of meat and poultry and contained a large cold-storage locker with suspended steel beams for hanging carcasses. The fourth section was a bakery. The four sections of the building were separated by thick masonry walls. Petitioner's premises also contained a railroad siding, truck *90 court, and parking facilities, all of which A&P used in connection with its operations. In 1964, A&P notified petitioner that it intended to vacate the premises when its current lease expired at the end of that year. A&P also discontinued its bakery operations at the Brooklyn Produce Warehouse and converted the former bakery area, which occupied about one-third of the building, into general warehouse space. Petitioner then entered into negotiations with A&P in an attempt to induce it to renew the lease. Petitioner offered to renovate parts of the building and other favorable lease terms. As a result of these negotiations, petitioner and A&P executed, on July 2, 1964, a Lease Modification and Extension Agreement, which provided, in pertinent part, as follows: 1. Petitioner agreed to make certain renovations of the demised premises at its own expense. Such renovations included removing the skylights in the area formerly occupied by the bakery, installing a new roof on the entire building, repairing or replacing all gutters and leaders, repaving the truck court, and repairing or replacing all sash and glazing. 2. Upon the completion of such renovation to A&P's satisfaction, *91 the term of the existing lease would be extended for a new period of ten years at an annual rental of $121,688 plus an additional rental (not to exceed $3,500 per year) equal to one-half the amount of any increase in the real estate taxes assessed against the property. 3. A&P at its option would have the privilege of three further extensions of the lease for periods of five years each, at an annual rental of $133,857 plus the specified additional rental geared to increases in real estate tax. 4. A&P was entitled to make at its own expense any alterations to the demised premises that might be necessary in the operation of its business. 5. All repairs and replacements to the demised premises, except incidental interior repairs, would be the responsibility of petitioner. 6. At the termination of the lease, A&P would be required to vacate and surrender the demised premises in their current condition and would not be obligated to restore the premises in any way. Petitioner made the specified renovations at a cost of $83,000. A&P continued in possession of the premises, and the new term of the lease commenced on January 1, 1965. During the taxable years in issue, A&P *92 did not give petitioner any indication that it intended to vacate the premises on December 31, 1974, nor had it yet made any decision on whether to vacate petitioner's premises at that time or further extend the lease. The following table shows pertinent financial data for the petitioner: 1964
1965
1966
1967
Income
Rent
$ 52,400.04
$121,688.04
$121,688.04
$121,688.04
Total deductions *
44,777.01
55,620.90
64,043.78
68,710.55
Taxable income
$ 7,623.03
$ 66,067.14
$ 57,644.26
$ 52,977.49
Federal income tax
$ 1,677.07
$ 25,212.23
$ 21,169.24
$ 18,929.20
Net income after taxes $ 5,945.96
$ 40,854.91
$ 36,475.02
$ 34,048.29
Tax-exempt interest -0-
1,099.12
2,975.00
2,975.00
Retained earnings 1/1
176,128.06
182,074.02
224,028.05
263,478.07
Retained earnings 12/31
$182,074.02
$224,028.05
$263,478.07
$300,501.36
All of petitioner's *93 rental income arose from its lease with A&P. In 1965, petitioner purchased $85,000 of New York City bonds bearing tax-exempt interest at 3-1/2 percent and maturing in 1982, 1983, and 1984. Petitioner's current assets, current liabilities, and net current assets at the close of the taxable years in issue were as follows: 1966
1967
Current Assets
Cash
$129,260.28
$187,228.54
Marketable securities
85,000.00
85,000.00
Other current assets 23,054.46
22,107.16
Total current assets
$237,314.74
$294,335.70
Current Liabilities
Taxes payable 21,938.81
21,875.88
Net Current Assets
$215,376.43
$272,459.82
Petitioner's only active officer or employee was its secretary, Harry Etra. On petitioner's behalf, he collected rental payments, paid taxes, procured insurance, inspected the premises and arranged for renovations and repairs, and dealt with petitioner's sole tenant. Petitioner did not pay Harry Etra any salary or other compensation for his services. From its inception through the taxable years in issue, petitioner did not pay any dividends nor did it make any loans, advances, or other expenditures for the benefit of its shareholders. Since *94 1968, when the respondent first questioned the purpose for petitioner's accumulation of its earnings, petitioner has distributed as dividends to its shareholders all of its net income after taxes. Another reason for such distributions since 1968 was the need for additional income felt by some of the widows and children who inherited stock in petitioner upon the death of several of the brothers who had founded the corporation, a need which did not previously exist when such brothers were earning income from other sources. During the taxable years in issue, the reported taxable income and the reported Federal income tax liability of petitioner's shareholders were as follows: Reported taxable income
Reported tax liability
Shareholder
1966
1967
1966
1967
Louis Etra
$85,445.32
$79,184.40
$36,456.69
$32,834.19
Gustave Etra
41,737.09
47,392.84
12,973.79
15,706.54
Max Etra
67,401.89
61,584.05
32,786.94
28,962.57
Harry Etra
73,373.71
68,091.24
29,198.55
26,270.15
Max J. Etra
29,000.92
45,338.18
7,490.36
14,729.09
Estate of William Etra, Trust F/B/O Rose Etra
23,314.91
22,373.68
7,601.69
7,216.84
Harvey Etra
41,048.95
41,643.51
12,643.55
12,928.88
Bernard Etra
56,431.93
65,499.67
20,668.43
24,483.35
*95 If petitioner's earnings and profits for 1966 and 1967 had been distributed among its shareholders rather than being allowed to accumulate in the corporation, their additional Federal income tax liability resulting from such distributions would have been as follows: Additional tax liability Shareholder
1966
1967 Louis Etra
$3,064.91
$2,821.27
Gustave Etra
2,560.21
2,439.79
Max Etra
3,320.58
3,015.62
Harry Etra
2,866.22
2,577.91
Max J. Etra
2,098.68
2,431.91
Estate of William Etra, Trust F/B/O Rose Etra
868.74
810.66
Harvey Etra
555.81
519.12
Bernard Etra
613.78
724.66
Petitioner's shareholders were also the shareholders of 56-19 Grand Ave. Corp., which owned a factory building at that address in Maspeth and leased it to a manufacturing company. On January 1, 1967, the tenant vacated such building and moved to New Jersey. Despite Grand Ave. Corp.'s intensive efforts to find a new tenant for its building, it was unable to do so and the building remained vacant until September 1, 1972. Grand Ave. Corp. incurred the following cash deficits during the years its building remained vacant: 1967
$18,747
1968
14,712
1969
17,897
1970
8,973
1971
20,864
*96 In 1972, Grand Ave. Corp. finally was able to lease its property to a builder who demolished the existing factory building and constructed a new rental building. In order to obtain this lease, Grand Ave. Corp. agreed to subordinate its interest in the property to the builder's mortgage for the construction of the new building. On April 1, 1970, respondent sent by certified mail a notice pursuant to section 534(b) [1] informing petitioner that he proposed to issue a notice of deficiency in regard to petitioner's taxable years 1966 and 1967, setting forth amounts with respect to the accumulated earnings tax imposed by section 531. On May 13, 1970, petitioner submitted a statement to respondent pursuant to section 534(c). ULTIMATE FINDINGS OF FACT 1. Petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of its business during 1966 and 1967. 2. Petitioner was formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead *97 of being divided or distributed during 1966 and 1967. OPINION As in every case involving the tax on unreasonable accumulation of earnings, we must resolve two basic and separate questions: (1) Did petitioner permit its earnings and profits to accumulate beyond the reasonable needs of the business, including "reasonably anticipated needs" (see section 537(a) (1)); (2) Did it have as its purpose "avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed" (see section 532(a)). See Alex Brown, Inc., 60 T.C. 364 (1973), affirmed per curiam, 496 F.2d 621 (C.A. 6, 1974). Section 533(a) provides that "the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." Petitioner having filed a statement pursuant to section 534(c) specifying that the ground for its accumulation of earnings was that there was a "strong possibility" *98 that A&P would not renew its lease upon its expiration on December 31, 1974, the Court ruled at the opening of the trial that the statement was insufficient to shift the burden of proof to respondent under section 534(a) (2). While we remain satisfied that petitioner's statement did not meet the requirements of section 534(c) (and petitioner has not addressed itself to this ruling on brief) (cf. Chatham Corp., 48 T.C. 145 (1967); Dixie, Inc., 31 T.C. 415, 427-430 (1958), affd. 277 F.2d 526 (C.A. 2, 1960)), as will subsequently appear, we are also satisfied that irrespective of the location of the burden of proof, an analysis of the record herein affirmatively shows that petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of the business. It is to that analysis to which we first direct our attention. At the outset, we note that we have serious doubts whether the evidence establishes the requisite connection between the claimed business needs and the reasons for the accumulations during the taxable years in issue, rather than "subsequently declared intentions which are merely the products of afterthought. *99 " Smoot Sand & Gravel Corp. v. Commissioner, 241 F.2d 197, 202 (C.A. 4, 1957), affirming on this issue T.C. Memo. 1956-82. See also Herzog Miniature Lamp Works, Inc. v. Commissioner, 481 F.2d 857, 863-864 (C.A. 2, 1973), affirming T.C. Memo. 1972-173; Estate of Goodall v. Commissioner, 391 F.2d 775, 798-799 (C.A. 8, 1968), affirming on this issue T.C. Memo. 1965-154; Dixie, Inc. v. Commissioner, 277 F.2d 526, 528 (C.A. 2, 1960). Both petitioner's section 534 statement dated May 13, 1970 and the testimony of its sole witness, Harry Etra, at the trial, which was held on January 17, 1974, articulate a contemporaneous intent rather than an exposition of the reasoning that motivated petitioner's officers and directors during 1966 and 1967. Our view of the record is such, however, that we need not rely on this element in resolving the question of business needs against the petitioner. The heart of the problem confronting us is the evaluation of the possibility that A&P would not renew its lease some seven-and-one-half years after the end of the last year in issue and of its impact on petitioner's *100 need for, and availability of, funds at that time. While this Court has consistently been chary of substituting its judgment for that of the officers and directors of a corporation (see, e.g., GPD, Inc., 60 T.C. 480 (1973); John P. Scripps Newspapers, 44 T.C. 453, 468 (1965)), we are convinced that such possibility was at best speculative and did not achieve the level of "likelihood" or "economic reality" required by the decided cases. Smoot Sand & Gravel Corp. v. Commissioner, supra, 241 F.2d at 206; Dixie, Inc. v. Commissioner, supra, 277 F.2d at 528; Havens & Martin, Inc. v. United States, an unreported case ( E.D. Va. 1965, 15 A.F.T.R. 2d 1140, 65-1U.S.T.C. par. 9417). See also section 1.537-2(c) (5), Income Tax Regs. ("unrealistic hazards"). To be sure, petitioner had had some difficulty with A&P in 1964 in obtaining a renewal of its lease, but that problem had been satisfactorily resolved on a long-term basis and A&P continued in a location which it had occupied for many years and in a building which met its particular needs. Nor are we impressed with the experience of petitioner's officers, directors, and *101 shareholders with the vacancy in another building in the neighborhood utilized for a totally different purpose, i.e., a factory. We think that at best petitioner had no more than a possible future business problem during the years at issue. We also find it significant that petitioner's own evaluation of the extent of its need for funds in 1974 was, in the words of Harry Etra, an "estimated guess." Such a characterization by an interested witness, coupled with the absence of any corroborating evidence, amounts to more than a failure of proof; it furnishes a basis for concluding the opposite of the fact advanced in the testimony. See Herzog Miniature Lamp Works, Inc. v. Commissioner, supra, 481 F.2d at 863. Beyond this, we think the petitioner could not ignore the cash flow which it would obtain from the rental income during the balance of the lease. Even allowing for some increase in expenses during that period, we are satisfied that, even with the payment of some dividends during the years in question, petitioner would have had available some $400,000 in liquid assets by January 1, 1975. The prospect of future liabilities can obviously be taken into account by businessmen *102 but they offer no absolute sanctuary for a decision to accumulate rather than distribute as against doing a "bit of both." See Estate of Goodall v. Commissioner, supra, 391 F.2d at 797. Cf. Battelstein Investment Co. v. United States 442 F.2d 87, 89 (C.A. 5, 1971), affirming 302 F. Supp. 320 (S.D. Tex. 1969); Dixie, Inc. v. Commissioner, supra, 277 F.2d at 528. [2]
Finally, we note that, commencing in 1968, petitioner paid out its entire net income as dividends. Granted that the main reason for such action was respondent's questioning of the accumulations for 1966 and 1967 which led to the instant litigation, the hard fact remains that if petitioner's reason for the accumulations was valid, its own calculations of need clearly dictated that such subsequent accumulations be retained. Under these circumstances, petitioner's action in paying dividends undermines the credibility of its assertions herein. Cf. Battelstein Investment Co. v. United States, supra; Wilkerson Daily Corporation, Ltd., 42 B.T.A. 1266, 1274 (1940). Testing petitioner's *103 subjective concepts of necessity against the objective actual facts revealed by the record herein (see Herzog Miniature Lamp Works, Inc. v. Commissioner, supra, 481 F.2d at 864), we conclude on the basis of the entire record that petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business. On the issue of the existence of the proscribed purpose, the section 534 statement is without significance and the burden of proof remains at all times on the petitioner. Sandy Estate Co., 43 T.C. 361, 374 (1964). We recognize that, under some circumstances, the proscribed purpose may be found to be absent even though earnings and profits were permitted to accumulate beyond the reasonable needs of the business. See Bremerton Sun Publishing Co., 44 T.C. 566, 590 (1965). Such a situation, however, is premised upon the determination that the corporate taxpayer's purpose was bona fide as to what it believed to be such reasonable needs rather than founded on concern for the tax liability of its shareholders. Our analysis as to why petitioner's accumulations were not required by the reasonable needs of its business *104 leads us to conclude that such bona fide purpose did not exist. We are reinforced in this conclusion by several other factors. Petitioner never paid a dividend during its 25-year history prior to the years in issue, despite its apparent history of stable profitability. Neither did it pay any compensation to Harry Etra, its managing officer and shareholder, for his services to the corporation. All of petitioner's shareholders were in tax brackets of 50 percent or above. These factors are recognized as affirmative evidence of the proscribed purpose. Factories Investment Corporation v. Commissioner, 328 F.2d 781, 784 (C.A. 2, 1964), affirming 39 T.C. 908, 919 (1963); Raymond I. Smith, 33 T.C. 141, 154 (1959), affd. 292 F.2d 470 (C.A. 9, 1961); Battelstein Investment Co. v. United States, supra, 302 F. Supp. at 331. Furthermore, petitioner's action in distributing its entire net income commencing in 1968 also suggests that prior earnings were accumulated to avoid tax at the shareholder level. In view of our conclusion, we need not consider respondent's alternative contention that, during the years in issue, petitioner *105 was "a mere holding or investment company" within the meaning of section 533(b). Decision will be entered for the respondent. Footnotes
*. According to the tax returns, the deductions were for real estate taxes, New York State franchise tax, New York City business tax, insurance, legal and accounting and depreciation plus $920.00 and $7,900.65 for repairs in 1964 and 1967, respectively, and $69.30 for "sundry" in 1966. ↩
1. Statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
2. See also Powder Mill Realty Trust, T.C. Memo. 1973-149↩.