**HERZOG MINIATURE LAMP WORKS, INC., Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 667, Docket 72–2423.

United States Court of Appeals, Second Circuit.

Argued May 31, 1973.

Decided June 29, 1973.

858

Jerome Kamerman, New York City, for appellant.

William A. Friedlander, Atty., Tax Div., Dept. of Justice (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks and Gordon S. Gilman, Attys., Tax Div., Dept. of Justice, on the brief), for appellee.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

MOORE, Circuit Judge:

Herzog Miniature Lamp Works, Inc. ("taxpayer") petitions for a review of a decision of the Tax Court of the United States, 31 TCM 847 (1972), sustaining the Commissioner's determination of deficiencies in income tax for its fiscal years 1966 and 1967 in the amounts of $8,612.23 and $12,701.27, respectively. These deficiencies resulted from the Commissioner's imposition of an accu-

mulated earnings tax pursuant to § 531 [1] of the Internal Revenue Code of 1954 for each year in question. The Tax Court found that Herzog had permitted its earnings and profits to accumulate beyond the reasonable needs of its business,[2] in violation of § 533 of the Code,[3] and that it was "availed of" during the years in question for the purpose of allowing its sole shareholder and president, Charles Perrenod, to avoid paying income tax, by permitting earnings to accumulate instead of being divided and distributed.[4] We find no error and affirm the judgment.

The facts are set out in detail in the Tax Court's opinion. We summarize them here. Taxpayer is a New York corporation engaged in the manufacture of miniature incandescent lamps, namely, miniature light bulbs. Charles Perrenod was its sole shareholder and its president. The process employed by taxpayer in its manufacture of miniature lamps is important to the resolution of the issues presented: the lamps are made by placing two or more fine wires onto a glass bead and winding a filament on the wires. The mounted wires are then inserted into a glass tube or globe, to which the bead is sealed. The air in the tube is then evacuated and the tube is cut off at its end. A metal base may be affixed to some models, thus completing the lamps.

Taxpayer carried out this process solely by hand labor (100 persons were employed). However, automatic machinery was available to do the same work, at greatly reduced cost. The unit cost of a hand-made bulb was 20 cents; that of a machine-made one was about 4.2 cents, providing there was a volume sufficient to justify the adjusting and setting up of the machinery. The bulbs manufactured by the taxpayer were primarily for "specialized" purposes, and the specifications and quantities required made it impractical to set up automated production facilities. The Bader Machinery Co. of England ("Badalex") was a supplier of the machinery necessary to automate the production of the miniature bulbs. The principal manufacturers of mass-produced miniature lamps included Westinghouse and General Electric, both of whom were also customers, potential customers, and/or competitors of the taxpayer for certain types of "specialty" lamps.

On or about February 23, 1962, taxpayer received an order from Westinghouse for the manufacture of 1,600,000 aircraft instrument lamps of taxpayer's

1. § 531. Imposition of accumulated earnings tax
    In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—
    (1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus
    (2) 38½ percent of the accumulated taxable income in excess of $100,000.

2. Section 537 provides that, for purposes of the accumulated earnings tax, the term "reasonable needs of the business" includes reasonably anticipated needs of the business.

3. § 533. Evidence of purpose to avoid income tax
    (a) Unreasonable accumulation determinative of purpose.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

4. § 532. Corporations subject to accumulated earnings tax
    (a) General rule.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

design. The order provided for the delivery of 100,000 lamps per month for the first six months and 150,000 per month thereafter. Taxpayer delivered 1,309,000 lamps between May 14, 1962, and October 7, 1963, at which time the balance of the Westinghouse order was cancelled.

Perrenod believed that he lost the Westinghouse order because he could not deliver sufficient quantities in the time required by Westinghouse; he thus began to consider the acquisition of automatic machinery, so that taxpayer could produce larger quantities. Perrenod in 1965 therefore went to England to observe the machines manufactured by Badalex. The equipment consisted of four different machines, each doing a different process. The first stage of mounting wires on the glass bead and winding on the filament was done by a machine called "the bead mount mill." The remaining three stages were done by other machines. The entire line was capable of producing lamps at the rate of

2,000 per hour. By hand, one worker could make about 25 per hour.

In October of 1965 taxpayer ordered from Badalex the machine called "the bead mount mill," the machine which performed the first of the four stages described above. The machine was delivered and installed in the fall of 1966, at a total cost of $25,000.[5] After operating the machine intermittently for a few months, it was shut down and has not been used since. Perrenod discovered (what should have been obvious) that rapid production by the first stage machine without the other three machines performing the other three stages to complete the job only created a bottleneck and hence resulted in no real production advantage.

Taxpayer's gross sales for the years 1965, 1966, and 1967 were $392,692, $399,654, and $450,410, respectively. In those years it retained or accumulated earnings of $114,793, $149,174, and $197,588, respectively.[6] On its income

5. Taxpayer also purchased a machine called a "filament drum feed," to be used for winding filaments in certain specialty lamps. 31 TCM at 848.

6. As stipulated by the parties, taxpayer's balance sheets for the taxable years as of December 31, 1965 to 1967, inclusive, were as follows:

| Assets | 12/31/65 | 12/31/66 | 12/31/67 |
|---|---|---|---|
| Cash | $140,720.00 | $ 70,374.00 | $195,019.00 |
| Escrow | ........ | 85,000.00 | ........ |
| Loans to stockholder | 36,999.00 | 4,188.00 | 24,188.00 |
| Accounts receivable | 5,339.00 | 12,823.00 | 15,786.00 |
| Inventory | 15,900.00 | 16,600.00 | 12,100.00 |
| Fixed assets | 34,342.00 | 34,792.00 | 29,261.00 |
| Deposit | 6,000.00 | 6,000.00 | 6,000.00 |
| Investment— | | | |
| Fisk Factors Corp. | 30,000.00 | 30,000.00 | 30,000.00 |
| Loans rec.— | | | |
| Fisk Factors Corp. | 95,000.00 | 95,000.00 | 95,000.00 |
| Total | $364,300.00 | $354,777.00 | $407,354.00 |

| Liabilities & Capital | 12/31/65 | 12/31/66 | 12/31/67 |
|---|---|---|---|
| Accounts payable | $ 45,000.00 | $ 964.00 | $ 854.00 |
| Other current liabilities | 4,507.00 | 4,639.00 | 8,912.00 |
| Capital stock | 200,000.00 | 200,000.00 | 200,000.00 |
| Retained earnings | 114,793.00 | 149,174.00 | 197,588.00 |
| | $364,300.00 | $354,777.00 | $407,354.00 |

The fixed assets carried on the balance sheet of December 31, 1965, at a cost of $34,342 included the Badalex bead mount machine which had been acquired at a cost of approximately $25,000. The building in which operations were carried on was owned by Perrenod and leased to taxpayer at an annual rental of $20,000.

tax returns for 1966 and 1967, taxpayer reported, as salary paid to its president and sole shareholder, Perrenod, the sums of $35,600, and $16,160, respectively. During the year 1967, taxpayer paid Perrenod a dividend of $10,000; no dividend was paid in 1966. The taxpayer also advanced "loans" to Perrenod from time to time, as needed by him for his personal use. These loans, in the years 1965, 1966, and 1967, amounted to $36,999, $4,188, and $24,188, respectively. In addition, taxpayer owned one-half of the stock (its accountant owned the other half) of Fisk Factors Corp., a factoring company which engaged in the making of short-term loans. During the years in question, Fisk's sole borrower was having financial difficulties and ultimately became bankrupt. Therefore, the sum of $125,000 loaned to or invested in Fisk Factors Corp. could not be realized by taxpayer.

Pursuant to § 534(b) of the Code, on December 10, 1969, the Commissioner notified taxpayer of his intent to propose a deficiency for the tax years 1966 and 1967, with respect to the accumulated earnings surtax imposed by § 531. Petitioner responded to the Commissioner's notification with a timely statement, pursuant to § 534(c), of its justification for accumulating earnings and profits during the years in question:

> Please be advised that with reference to your audit of the Herzog Minature Lamp Works, Inc. for the years 1966 and 1967, we hereby protest the findings of your office for additional tax due. It has been the plan of this corporation to accumulate sufficient funds for a major overhauling and expansion of the premises. The equipment of this corporation is all but fully depreciated and no piecemeal process of replacement will suffice to enable this corporation to compete successfully with its competors [*sic*]. We therefore have had to make preparations in the form of accumulation of funds of a considerable sum of money to pursue our plans.

A notice of deficiency was subsequently mailed to taxpayer on March 5, 1970. Ruling that the burden of proof was on taxpayer to show that its accumulations were not beyond the reasonable needs of its business, since the statement submitted by it pursuant to § 534(c) was insufficient to shift the burden to the Commissioner, the Tax Court held that "[t]he evidence offered by [taxpayer] not only fails to sustain that burden, but tends to prove the opposite." 31 TCM at 850. The Court affirmed the Commissioner's deficiency determination.

■ The sole issue on appeal is whether the taxpayer is liable for the surtax imposed by § 531 of the Code, because it accumulated earnings and profits beyond reasonable business needs, thereby bringing itself within § 533. The issue is primarily one of fact for the Tax Court's determination on the whole of the record before it, American Metal Prods. Corp. v. Commissioner, 287 F.2d 860, 864 (8th Cir. 1961); and absent clear error, the Tax Court's determination will not be disturbed, *id.;* Hardin v. United States, 461 F.2d 865, 871 (5th Cir. 1972); I. A. Dress Co. Inc. v. Commissioner, 273 F.2d 543, 544 (2d Cir.), cert. denied, 362 U.S. 976, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960).

■ The accumulated earnings tax is designed to deter use, usually by shareholders of a closely held corporation, of the corporate entity to avoid income tax liability. The purpose of the tax "is to compel the company to distribute any profits not needed for the conduct of its business so that, when so distributed, individual stockholders will become liable" for taxes on the dividends received, United States v. Donruss Co., 393 U.S. 297, 303, 89 S.Ct. 501, 505, 21 L. Ed.2d 495 (1969), quoting Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 699, 63 S.Ct. 843, 87 L.Ed. 1086 (1943); Electric Regulator Corp. v. Commissioner, 336 F.2d 339, 346 (2d Cir. 1964). *See generally,* Comment, The Accumulated Earnings Tax: Displacement of the Avoidance Test and a Suggested Busi-

ness Purpose Test, 10 B.C.Ind. & Com.L. Rev. 919 (1969). The burden of proof rests with taxpayer, under § 533, which provides that the accumulation of earnings and profits "beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with regard to shareholders, unless *the corporation by the preponderance of the evidence shall prove to the contrary.*"[7] However, under § 534, if the taxpayer submits to the Commissioner a statement of the grounds and facts on which it relies to establish that there has been no unreasonable accumulation, taxpayer can shift the burden of proof to the Commissioner with respect to the grounds set out in its statement. *See* Factories Investment Corp. v. Commissioner, 328 F.2d 781, 783 (2d Cir. 1964). The burden will not shift to the Commissioner, however, if "the ground or grounds on which the taxpayer relies are not relevant to the allegation or, if relevant, the statement does not contain facts sufficient to show the basis thereof." Treasury Reg. § 1.534–2(b)(2) (26 C.F.R. § 1.534–2(b)(2)). We find no error in the Tax Court's ruling that taxpayer's statement, quoted *supra,* was too broad and general in scope so as to shift the burden to the Commission.

■ After reviewing the evidence before it, the Tax Court concluded that taxpayer's evidence was insufficient to sustain taxpayer's burden of proof. The Court noted that taxpayer, in the years in question, had a cash surplus equal to ten times its inventory and no liabilities. Even though Perrenod had purchased one machine from Badalex in 1965 for the purpose of automating the manufacture of lamps, by 1972 the corporation had still not done anything positive about automating, and had not used the one machine it had purchased. The Court concluded: "Although we do not doubt that Charles Perrenod may have entertained the ambition from time to time to go into the mass production of these lamps, the record fails to show that he ever went so far as to adopt or even seriously to consider such a plan." 31 TCM at 851.

On appeal taxpayer argues that the Tax Court clearly erred in its findings, and in disbelieving the testimony of Perrenod and taxpayer's accountant as to the true purpose in accumulating its earnings. Taxpayer argues that it needed to accumulate about $600,000 before it could fully automate its plant; that the decision to withhold dividend distributions was motivated solely by Perrenod's desire to mechanize the plant, and not by an intent to avoid the income tax; that Perrenod did not believe in borrowing money in order to automate sooner than was possible by accumulating earnings, since Perrenod was styled as "an extremely conservative" businessman; and that taxpayer's decision to automate was clearly supported by the 1965 purchase of the "bead mount mill" machine from Badalex.

We agree with the Tax Court that Perrenod's intention to use the taxpayer's accumulation of earnings for the proscribed purpose may be seen from a review of the record as a whole. First is

7. Treasury Regulation § 1.537–1(b) (26 C.F.R. § 1.537–1(b)) provides:

(b) *Reasonable anticipated needs.* (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.

the fact that taxpayer offered no convincing evidence that a concrete decision to automate its plant had ever been made. Taxpayer relied almost entirely on the testimony of Perrenod, its president, and Sidney Fried, its accountant, to prove the existence of a fixed and definite plan, adopted in 1963, for fully automating its lamp-making plant as soon as it accumulated sufficient earnings to acquire and install the machinery ($175,000) and to provide sufficient working capital ($325,000 to $450,000) for the expected greater volume of business resulting from automation. The Tax Court was not required to credit fully the testimony of such interested parties, however; Braunstein v. Commissioner, 305 F.2d 949, 952 (2d Cir. 1962), affirmed, 374 U.S. 65, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963); Factories Investment Corp. v. Commissioner, *supra,* 328 F.2d at 784. Rather, the Court could, and did, scrutinize taxpayer's actions between 1963 and 1972, for the purpose of determining whether taxpayer's proposed intention was "manifested by some contemporaneous course of conduct directed toward the claimed purpose," American Metal Prods., *supra* 287 F.2d at 864; Dixie, Inc. v. Commissioner, 277 F.2d 526, 528 (2d Cir.), cert. denied, 364 U.S. 827, 81 S.Ct. 62, 5 L. Ed.2d 54 (1960) ("Definiteness of plan coupled with action taken toward its consummation are essentials"). The record is not replete with actions supportive of taxpayer's position. Even as late as 1972, nine years after Perrenod testified he had decided to automate and 5–6 years after the 1966–67 accumulation here at issue, no concrete steps were taken to implement the plan; the one machine purchased in 1966 lay dormant for six years after its purchase.[8] Under these circumstances, the Tax Court could properly conclude that the intention claimed by taxpayer had not been manifested by a convincing course of conduct on taxpayer's part.

Other facts supported the Tax Court's rejection of the conclusions urged by taxpayer. Taxpayer, having the burden of proof, failed to provide any statements as to the amount of earnings accumulated in years after 1967 in order to explain why, as late as 1972, it still had not commenced the program of complete automation. Accumulation of earnings had apparently been a policy of taxpayer for some time prior to the two years here in issue. It seems also to have been the policy to make only limited payments of compensation to Perrenod and to provide him with interest-free loans, thus leaving the maximum possible amounts in the corporation and enabling Perrenod to avoid higher income taxes. As we held in United Business Corp. v. Commissioner, 62 F.2d 754, 755 (2d Cir.), cert. denied, 290 U.S. 635, 54 S.Ct. 53, 78 L.Ed. 552 (1933), another accumulation of earnings case, such loans to a sole stockholder are to be viewed with circumspection, since they "entirely accord with a desire to get the equivalent of [the stockholder's] dividends under another guise." *See also,* Oyster Shell Prods. Corp. v. Commissioner, 313 F.2d 449, 454 (2d Cir. 1963). Moreover, the record disclosed that taxpayer had lost $125,000 by investing in an unrelated business (Fisk Factors Corp.), an investment which more normally would have been made by Perrenod himself; when "retained earnings are idle or are invested for purposes unrelated to the business,

---

8. The Tax Court found that:

The bead mount machine acquired by the petitioner in 1966 does not indicate any intent on the part of the petitioner to go into the mass market. Certainly, it could have been utilized for that purpose if the petitioner had acquired the remaining equipment which would be needed to set up an automated production line. There is, however, no evidence that the petitioner ever seriously intended to acquire such equipment. On the contrary, the bead mount machine was acquired with a filament drum feed to be used in producing special filaments, thus enabling the petitioner to utilize the machine as the first step in what was otherwise a hand-made lamp.

31 TCM at 851.

the accumulation becomes suspect." Oyster Shell Prods. Corp. v. Commissioner, *supra*, 313 F.2d at 454.

Taxpayer relies on a number of Tax Court decisions against the Commissioner in § 531 accumulated earnings cases to support its argument that the Court's decision here was erroneous. Taxpayer particularly relies upon Carolina Rubber Hose Co. v. Commissioner, 24 TCM 1159 (1965); Knoxville Iron Co. v. Commissioner, 18 TCM 251 (1959); Penn Needle Art Co. v. Commissioner, 17 TCM 504 (1958); and Magic Mart Inc. v. Commissioner, 51 TC 775 (1969).

As the Tax Court said in *Knoxville, supra,* "[E]ach case rests upon its own peculiar facts and circumstances", 18 TCM at 261, citing Olin Corp. v. Commissioner, 128 F.2d 185, 187 (7th Cir. 1942). However, a common thread runs through these decisions sustaining the taxpayer, namely, some tangible indicia of intent to carry out a concrete plan. Minutes of stockholders' and directors' meetings revealing intent, the setting aside of funds in short-term liquid securities, the absence of personal loans to stockholders (here loans to the sole stockholder), the absence of investments in unrelated businesses (here investments in Fisk Factors Corp.), the payment of adequate dividends, and actual steps taken to accomplish the express intent are among the factors which moved the courts to uphold accumulations in the above-cited cases.

Whatever thoughts (subjective of necessity) taxpayer, through Perrenod, may have had in 1966 and 1967, the Tax Court was entitled to test them objectively against the actual facts as revealed up to and including 1972. So tested, the Tax Court was clearly correct, and certainly not "clearly erroneous", in concluding that taxpayer had failed to meet its burden of proving that it had in 1966 and 1967 a "specific, definite and feasible" plan sufficient to justify the accumulations made allegedly for such purpose. *See* Dixie, Inc. v. Commissioner, *supra*, 277 F.2d at 528.

The decision of the Tax Court is affirmed.