PETROZELLO COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Petrozello Co. v. Commissioner
Docket No. 2766-80.
United States Tax Court
T.C. Memo 1983-250; 1983 Tax Ct. Memo LEXIS 537; 46 T.C.M. (CCH) 63; T.C.M. (RIA) 83250; May 5, 1983. John J. O'Toole, for the petitioner. Robert B. Marino, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined corporate income tax deficiencies of $13,623, $15,664, and $44,259 for petitioner's respective fiscal years ending September 30, 1974, September 30, 1975, and September 30, 1976. The sole issue is whether, under section 532(a), [1] petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders, by permitting earnings and profits to accumulate instead of being divided *540 or distributed. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. When it filed its petition, petitioner was a New Jersey corporation with its principal office in Orange, New Jersey. Petitioner filed Form 1120 corporate income tax returns for its fiscal years ending September 30, 1974, September 30, 1975, and September 30, 1976. Petitioner used the cash receipts and disbursements method of accounting. Petitioner and the Cassini Family
Joseph Cassini, Jr. (Cassini) and Ann M. Cassini (Ann) are married to each other, and Joseph Cassini, III (Joseph) is their son. Petitioner was incorporated on July 30, 1962, and is a closely-held corporation. Petitioner's original shareholders were James Petrozello (Petrozello), Ann (the daughter of James Petrozello), Cassini's brother William, and Cassini's sister Emily. From petitioner's *541 incorporation until at least September 30, 1976, Cassini was neither a shareholder nor an officer of petitioner. During the years before the Court, Ann was petitioner's principal and controlling stockholder, and Joseph owned the remaining minority interest. During these years Ann served as petitioner's President and Secretary/Treasurer. Joseph was attending law school at Notre Dame University in South Bend, Indiana, during these years. Petitioner is one of several corporations owned by Cassini family members. Basides petitioner, the Cassini family corporations are Central Salvage Company (Central), Delaware Sanitation Company (Delaware), Municipal Sanitary Landfill (MSL), James Petrozello Company (JPC), Meplewood Disposal Company (Maplewood), Solid Waste Carrier (Carrier), and Meadow Rental Company (Meadow). Cassini is President of JPC, and President and principal shareholder of both Central and Delaware. James Petrozello incorporated JPC in 1946. Since then, JPC has been in the solid waste business, collection and disposing of trash. JPC contracted from tash collection primarily with municipalities, but also contracted with small businesses and factories. JPC leased *542 and operated a landfill site for trash disposal. Sometime around 1948, Cassini married Petrozello's daughter, Ann, and began working for JPC. He began as a laborer and later advanced into management, where he learned about bidding for municipal contracts. He became President of JPC in 1967 after Petrozello's death. Petitioner was formed in 1962 to engage in the demolition service business. Demolition involves the destruction of buildings and disposal of the resulting waste. This demolition business was complementary to JPC's waste disposal business, since the demolition waste could be used to stabilize the landfill and the filled land could eventually be used for more productive purposes or sold at a profit. Petitioner owned heavy equipment necessary for its demolition business, including bulldozers, front-end loaders, cranes, and dump trucks. Petitioner ceased doing demolition work sometime in 1967 after Petrozello's death. Thereafter, petitioner leased out its equipment to related companies and at times to unrelated interests. During the years before the Court, petitioner's only activity was leasing equipment to related entities. Petitioner's Income and Assets - *543 Fiscal Years 1974-1976
For the years in issue, petitioner filed corporate income tax returns that reported the following: FYE September 30
1974
1975
1976
Gross Receipts
$193,628
$162,307
$354,802
Cost of Goods Sold
Dividend Income
926
1,315
1,320
Interest Income
8,732
12,537
11,261
Taxable Income
77,658
104,536
251,305
Petitioner derived all of these gross receipts from leasing its equipment to related entities. During these years, petitioner did no demolition work. During these years, petitioner did not incur any advertising expenses, did not have a telephone or incur any telephone expenses, did not maintain any inventories, did not maintain a sales journal, and did not have any trade accounts receivable. [2]
During these years, petitioner paid *544 the following salaries: FYE September 30
Ann
Joseph
1974
$42,000
$9,600
1975
12,000
7,200
1976
12,000
10,400
Ann and Joseph were petitioner's only employees during the years in question. Any services rendered by Ann or Joseph were rather minimal. [3] However, except for $11,000 of Ann's 1974 compensation, respondent has allowed deductions for all of these salaries. In addition to salaries, petitioner claimed and was allowed deductions for miscellaneous expenses, such as taxes, licenses, professional fees, supplies and tools, which were paid from petitioner's bank accounts. Among the expenses claimed by petitioner each year were rental payments to Ann and Joseph for the lease of a garage. *545 During the years in issue, petitioner's assets, liabilities, and shareholders' equity were as follows: [4]
FYE September 30
1974
1975
1976
Assets: Cash
$ 8,274 $ 45,181 $ (24,811)
Receivables: Delaware Sanitation
$1,000
Joseph Cassini III
5,000
$5,000
Carteret Land and
66,243
55,393
$38,697
Development
Total
72,243 60,393 38,697 Loans Receivable
Central Salvage
75,000
Solid Waste Carrier
1,200
Total
$ 76,200 Investments: Common Stocks
13,728 20,663 25,406 Commercial Paper
48,888 75,000 223,942 Government Bonds
99,072 99,073 99,073 Depreciable
Property
43,591 30,279 131,980 TOTAL ASSETS
$285,796 $330,589 $570,487 Liabilities: Accounts Payable
$ 7,930 $ 12,854 $ 58,016 Loans Payable: Joseph Cassini,
Jr.
40,826
24,035
Other Loans
6,055
73,850
Total
46,881 24,035 73,850 Total Liabilities
$ 54,811 $ 36,889 $131,866 Shareholders'
Equity: Capital Stock
1,000 1,000 1,000 Retained
Earnings
249,379 305,159 445,472 Unrealized
Loss on Value
(19,394)
(12,459)
(7,851)
of Common
Stocks
Net Shareholders'
Equity
230,985 293,700 438,621 TOTAL LIABILITIES
AND SHAREHOLDERS'
EQUITY
$285,796 $330,589 $570,487 *546 *547 At the end of fiscal year ending September 30, 1973, and at the beginning of the period here in issue, petitioner had retained earnings in the amount of $206,044. None of the receivables listed above was evidenced by a note or other writing; none of these receivables provided for interest. Cassini and Ann filed joint Federal income tax returns for their taxable years 1974 and 1975 which indicated the following: 1974
1975
Taxable Income
$377,013
$314,170
Tax Liability
188,966
149,449
Prior to September 30, 1976, petitioner had never paid any cash dividends to its shareholders. Bidding on Scavenger Contracts
Under New Jersey law, any person engaged in solid waste collection or solid waste disposal must possess a certificate of public convenience and necessity issued by the New Jersey Board of Public Utility Commissioners. Petitioner obtained such a certificate in 1970 and retained it until about June 30, 1973. Since then, petitioner had not possessed the required certificate. During the years in question, and until at least 1981, JPC did possess a certificate of public convenience and necessity. During 1956, the City of Newark, New Jersey *548 (Newark or the City), publicly advertised bids for replacing its municipal garbage scavenger collection operation for the south end of the City and five firms submitted bids. This occurred before petitioner came into existence. Through another entity, Cassini submitted a bid. All bids submitted to the City in 1956 exceeded what the City itself spent for refuse collection in the south end, and the City did not award a contract. Over the years the members of the City Council were generally opposed to contracting out refuse collection to private firms, and the record does not indicate any serious consideration by the City of contracting out until sometime in 1976. During early 1976, Newark experienced a budget crisis, and Alvin Zach of the City's Department of Engineering (the Department) proposed replacing its municipal garbage scavenger collection operation with private contractors. Early in February of 1977, the Department finalized the contract specifications. On February 9, 1977, the City publicly advertised bids for replacing one-third of its municipal garbage scavenger collection operations with collection by private contractors. On March 23, 1977, Newark received the first *549 bids for solid waste collection services. Statewide Environmental Contractors, Inc., and Browning Ferris Industries submitted the only bids. Neither petitioner nor any of its related corporations submitted a bid at that time. The City rejected both March 23, 1977 bids as excessive. George Katz (Katz) is an individual who, by 1977, had 20 years experience in collecting and disposing of garbage. Through businesses in which Katz held interests of 25 to 50 percent, [5] Katz had contracted with several New Jersey municipalities for solid waste disposal. On June 24, 1977, Katz incorporated American Collectors. On the same day, American Collectors applied to the Public Utility Commission for a certificate of convenience and necessity; the certificate was issued on January 26, 1978. On June 27, 1977, JPC and American Collectors formed a joint venture called Pet-Am. The sole purpose of the joint venture was to bid, perform, and complete a solid waste collection contract with Newark, to be awarded by bid on June 28, 1977. On June 28, 1977, Newark received this second round of bids for collecting *550 solid waste. Jersey Waste Systems, Pet-Am, Sea Bell Sanitation, and B.F.I. of North Jersey submitted the new bids. On December 21, 1977, the Newark Municipal Council rejected all bids received by the Director of Engineering for the proposed solid waste collection contract. On February 3, 1978, Pet-Am sued Newark seeking to have the court order the Municipal Council to enter into the proposed contract with Pet-Am. Finally, in order to settle Pet-Am's lawsuit against the City, on February 27, 1979, the Newark Municipal Council ordered the Director of Engineering to award the scavenger collection contract for one-third of the City to Pet-Am. On March 8, 1979, Pet-Am entered into a three-year agreement with the City of Newark for solid waste collection. In 1981, the City of Newark was consideing the possibility of expanding its use of private contractors to collect garbage. The City hired a special consultant to review the efficiency of private contractors' work in comparison with the efficiency of the City itself collecting garbage. The City was awaiting the results of this analysis before making its decision whether to contract out any more of its garbage collection services.As *551 of the date of trial, the analysis had not been completed, and the City had reached no decision. Petitioner has never bid on a contract for solid waste collection and has never engaged in the business of solid waste collection. Neither petitioner's corporate minutes nor its inter-office or intra-office memoranda discuss placing bids on any garbage collection contract for any local community. The equipment that petitioner had used in its demolition work up to 1967, which equipment was leased out during the years before the Court, was too heavy to be used for municipal garbage collection work. Petitioner's Section 534 Statement
On November 16, 1979, respondent mailed to petitioner a notice pursuant to section 534(b), advising that respondent proposed to issue a notice of deficiency for the years in question including the imposition of an accumulated earnings tax under section 531. On December 7, 1979, respondent mailed a notice of deficiency to petitioner seeking deficiencies generated by the tax on accumulated earnings for petitioner's fiscal years ended September 30, 1974, September 30, 1975, and September 30, 1976, in the respective amounts of $13,623, $15,664, and $44,259. *552 On January 8, 1980, petitioner mailed its section 534(c) statement in response to respondent's section 534(b) notice. The statement was signed under penalties of perjury by Cassini, purportedly as petitioner's President. OPINION The issue we must decide is whether petitioner is liable for the accumulated earnings tax imposed under section 531. As a preliminary matter, we will decide whether the burden of proof as to petitioner's reasonable business needs shifted to respondent under the provisions of section 534. [6] Prior to the trial, the Court held a hearing pursuant to section 534 and Rule 142(e) and determined that the burden of proof regarding petitioner's reasonable needs for accumulating earnings and profits remained upon petitioner. At trial petitioner renewed its burden of proof arguments and the Court stated that it would permit petitioner to reargue the burden of proof issue on brief. *553 Petitioner's principal argument is that respondent's mailing of the deficiency notice less than 30 days after mailing his section 534(b) notification to petitioner invalidated the notification, so that the burden of proof with respect to reasonable business needs falls on respondent under section 534(a)(1) as if no notification had been sent by respondent. Mindful of this Court's opinion in Manson Western Corp. v. Commissioner,76 T.C. 1161 (1981), petitioner seeks to distinguish that case, because there the deficiency notice was mailed more than 30 days after the section 534(b) notification but less than the full 60 days prescribed in the regulations for the taxpayer to submit its section 534(c) statement. Petitioner tries to read the parenthetical "but not less than 30 days" requirement under section 534(c) into section 534(a)(1) and section 534(b). We do not agree with petitioner's reading of the statute and conclude that our Manson opinion is dispositive. Admittedly, the purpose of the section 534 procedure is to encourage the Internal Revenue Service to consider a taxpayer's section 534(c) statement before issuing a deficiency notice. However, the *554 minimum 30-day period for a taxpayer to submit its statement under section 534(c) has no bearing upon when respondent can send its section 534(b) notification, so long as that notification is sent "[b]efore mailing the notice of deficiency." Respondent's section 534(b) notification is valid if it is mailed at any time before respondent issues the notice of deficiency. "The language of section 534 will simply bear no other construction." Manson Western Corp. v. Commissioner,supra,76 T.C. at 1165. Thus, we reject petitioner's argument that we should treat this case as coming under section 534(a)(1) as if no section 534(b) notification had been sent by respondent. We next consider petitioner's argument that in any event under section 534(a)(2) its 534(c) statement was sufficient to shift the burden of proof to respondent. [7] The only explicit requirements of section 534(c) are a statement of the grounds for the accumulation and "facts sufficient to show the basis thereof." The regulations add no further requirements. See sec. 1.534-2, Income Tax Regs.The corporation's section 534(c) statement must be specific rather than general or vague, and must state *555 grounds, which, if true, would support a finding that the accumulation of earnings and profits was for the reasonable needs of its business. Herzog Miniature Lamp Works, Inc. v. Commissioner,481 F. 2d 857, 862 (2d Cir. 1973), affg. a Memorandum Opinion of this Court; Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566, 581-582 (1965). The ultimate truth or falsity of the allegations in the statement is not determinative of its adequacy for the purpose of shifting the burden of proof to respondent. Chatham Corp. v. Commissioner,48 T.C. 145, 147 (1967). If the facts of record establish, as petitioner's section 534(c) statement asserts, that petitioner intended to bid on contracts for garbage collection for the City of Newark, New Jersey, and intended to go into that business, petitioner would no doubt need its accumulated earnings and profits to purchase trucks and other necessary equipment. In light of the extensive formal and informal discovery tools available to parties before this Court, a taxpayer's section 534(c) statement is sufficient to shift the burden of proof to respondent as to any ground for an accumulation stated *556 therein if it outlines the basic facts necessay to notify respondent of the basis for the ground asserted. [8] Under this test and upon reconsideration of our ruling on burden of proof, as requested by petitioner, we conclude that petitioner's statement was sufficient to shift the burden of proof as to reasonable needs of the business to respondent as to the grounds given in petitioner's statement. An accumulated earnings tax is imposed upon "every corporation… formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed." Sections 532(a), 531. The ultimate question, upon which the corporate taxpayer has the burden of proof, is whether a purpose of its *557 accumulation was avoiding the income tax with respect to its shareholders (known as the "proscribed purpose"). United States v. Donruss Co.,393 U.S. 297 (1969). This is a question of fact. Atlantic Properties, Inc. v. Commissioner,519 F. 2d 1233, 1235 (1st Cir. 1975), affg. 62 T.C. 644, 656 (1974); American Metal Products Corp. v. Commissioner,287 F. 2d 860, 863-864 (8th Cir. 1961), affg. 34 T.C. 89 (1960); Kerr-Cochran, Inc. v. Commissioner,253 F. 2d 121, 124 (8th Cir. 1958), affg. a Memorandum Opinion of this Court. The major factor in determining the applicability of the accumulated earnings tax is whethere the corporate taxpayer accumulated its earnings and profits beyond its reasonable needs. United States v. Donruss Co.,supra,393 U.S. at 307; Faber Cement Block Co. v. Commissioner,50 T.C. 317, 327 (1968). See also Chaney & Hope, Inc. v. Commissioner,80 T.C. 263, 280-291 (1983). This is also a question of fact. Helvering v. National Grocery Co.,304 U.S. 282 (1938). A taxpayer's business includes *558 "any line of business which it may undertake," Section 1.537-3(a), Income Tax Regs., and a taxpayer's reasonable business needs includes its reasonably anticipated business needs. Section 537(a)(1). Section 1.537-1(b)(1), Income Tax Regs., provides: In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the *559 business. A taxpayer's reasonably anticipated needs are determined on the basis of the facts at the close of the taxable year. Breitfeller Sales, Inc. v. Commissioner,28 T.C. 1164, 1168 n. 4 (1957), and cases cited therein. Subsequent events may not be used to show that the retention of earnings or profits was unreasonable, but subsequent events may be considered to determine whether the taxpayer actually intended to consummate its plans for which its earnings and profits were allegedly accumulated. Section 1.537-1 (b)(2), Income Tax Regs.; Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 332-333. [9]
Under section 533(a), "the fact that the earnings and profits of a corporation are permitted to accumulated beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." As to the grounds contained in petitioner's section 534(c) statement, respondent has the burden of proving that *560 petitioner accumulated its earnings and profits beyond its reasonable business needs. Section 534(a)(2). Petitioner bears the burden of proof as to any additional grounds asserted for the reasonableness of its accumulations. Section 534 does not relieve petitioner of its overall burden of proving the absence of the proscribed purpose. Pelton Steel Casting Co. v. Commissioner,28 T.C. 153 (1957), affd. 251 F. 2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958 (1958). Petitioner's first ground is that the accumulation was necessary because it anticipated bidding upon and being awarded a contract for garbage collection services in Newark, New Jersey, for which it needed its accumulated funds to buy equipment. The statement alleged that the bids were to be forthcoming during 1974 but "[d]ue to administrative delays within the City's administration" did not occur until early 1977. The facts of record show otherwise. Alvin Zach of Newark's Department of Engineering testified that the proposal to contract out garbage collection services came during a budget crisis in early 1976, and that it was he who made the proposal. Cassini's vague *561 suggestions that there were earlier proposals are not borne out by the record, and the only specific information forthcoming from Cassini related to his dealings with Mayor Carlin some 20 years earlier, long before petitioner came into existence. There had been a proposal for contracting out Newark's garbage collection 20 years earlier, in 1956, and Cassini had submitted a bid (through an entity other than petitioner). The City had no definite plans to replace its own garbage collectors with private contractors from that time in the late 1950's until 1976 at the earliest, and probably not until 1977. While Cassini may have had discussions with members of the Newark Municipal Council about contracting out garbage collection to private companies, these "discussions" do not show that petitioner had "specific, definite, and feasible plans" for use of its accumulations. The record establishes that over the years the Newark Municipal Council had generally opposed contracting out the municipal garbage collection wok. Petitioner had ceased its demolition business in 1967 after Petrozello's death, and from that time on had been engaged only in the rental business, leasing out its equipment *562 to its related corporations and at times to some unrelated entities. The record does not show that petitioner had over engaged in the solid waste collection or disposal business and the suggestion that it was planning to go into that business appears to be an after-thought that came up after the audit. Also, under New Jersey law, petitioner could not collect garbage without a certificate from the State Public Utilities Commission (PUC). The evidence is uncontradicted that petitioner possessed no such certificate during any of the times it claimed to have been preparing to bid on garbage collection contracts. In its section 534(c) statement, petitioner claims that it first learned that it would be required to have the certificate in February of 1977 when the specifications for the Newark contract were made public. However, petitioner had applied for and been issued a PUC certificate in 1970, which lapsed in 1973, and Cassini's testimony indicates that he knew at that time of the requirements of state law. Cassini's testimony and petitioner's section 534 statement, signed by Cassini under penalty of perjury, are simply irreconcilable on this point. Moreover, it is far from clear *563 that the lack of a license was a barrier to petitioner's bidding on the contract--Pet-Am's joint venturer, American Collectors, did not possess a certificate when Pet-Am submitted its bid on the Newark contract, but it did acquire the certificate before the contract was awarded. Petitioner's section 534(c) statement further asserts that once having discovered that petitioner was an unqualified bidder, "a business decision was made" to have JPC, which possessed a PUC certificate, "be the co-joint-venturer on the Newark contract." Ostensibly, this choice was made because petitioner could not have obtained a PUC certificate before the bid date because its application "would have necessitated lengthy administrative hearings and proceedings," which could not be completed by the bid date. However, as noted above, American Collectors' lack of a PUC certificate did not prevent Pet-Am from bidding on the Newark contract. Furthermore, this assertion in the section 534(c) statement is contradiced by Cassini's own testimony concerning the lapse of petitioner's PUC certificate in 1973. Cassini testified that petitioner's certificate lapsed in 1973 due to a change in policy by the Public Utilities *564 Commission, which allowed only one PUC certificate to be held by commonly controlled family corporations. Cassini testified that in 1973 the decision was made to leave the certificate in JPC because it was the financially strongest of the family corporations. Thus, under Cassini's testimony at trial, petitioner could never have obtained a PUC certificate as long as the Cassini family maintained control of both petitioner and JPC, or as long as JPC possessed its PUC certificate. JPC was not likely to relinquish its certificate to petitioner, for by so doing it would no longer be qualified to perform its existing collection contracts with various New Jersey municipalities.And petitioner's suggestion that the Cassini family might have given up control of either JPC or petitioner is sheer speculation, because in fact the family members did not give up control of either corporation. At trial, Cassini suggested that petitioner had been planning to bid on the Newark contract as a joint venturer with JPC, which had a PUC certificate, and that at the time petitioner was accumulating its funds for bidding on the Newark contract, it believed that only one of the joint venturers needed *565 to possess the certificate. Cassini further testified that at sometime the Public Utilities Commission changed its policy to require that all joint venturers, rather than just one, possess a PUC certificate. Cassini did not indicate when this supposed policy change occurred, but it is clear that by the time Pet-Am submitted its bid in June of 1977, its joint venturers, JPC (of which Cassini was president) and American Collectors, recognized that both joint venturers needed to have a PUC certificate. Moreover, petitioner's section 534(c) statement indicates that the anticipated joint venture would have been between petitioner and a third party, not between petitioner and JPC, and that JPC was substituted for petitioner only when petitioner allegedly discovered that it was not a qualified bidder. There was no indication who the contemplated third-party joint venturer (ultimately American Collectors) was, or whether it possessed a PUC certificate. Again, petitioner's section 534(c) statement, signed by Cassini, and Cassini's testimony are inconsistent. Respondent has also rebutted the factual allegations of the second ground asserted in petitioner's section 534(c) statement. In its *566 statement, petitioner claims that it continued to accumulate funds because it anticipated participating in a joint venture with JPC upon a garbage collection contract for the remainder of the City of Newark. The statement asserts that the City's advertisement for bids would be forthcoming in the spring of 1980. However, at trial, Alvin Zach of Newark's Department of Engineering testified that as of the time of the trial the City had not yet determined whether it would contract out for scavenger services for the remainder of the City. Even assuming the truth of petitioner's factual allegations, its plans were not sufficiently "specific, definite, and feasible." Moreover, the fact remains that petitioner did not possess the required PUC certificate to enable it to perform scavenger services. Although JPC had a PUC certificate, Cassini testified that PUC required both joint venturers to have the certificates in order to perform collection services. Under his testimony, the only way both petitioner and JPC could have the requisite certificates would be for the Cassini family to give up control of one of the two corporations, which they did not do. Other factors also indicate that *567 petitioner did not have "specific, definite, and feasible plans" for using its accumulated funds in performing scavenger contracts with the City of Newark. Petitioner has no written records, either minutes or internal memoranda, discussing its bidding on garbage contracts. While a closely-held corporation need not formalize its business plans in its minutes, John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 469 (1965), there still must be some outward manifestation of conduct evidencing the claimed purpose. Dixie, Inc. v. Commissioner,277 F. 2d 526, 528 (2d Cir. 1960), affg. 31 T.C. 415 (1958), cert. denied 364 U.S. 827 (1960). The only evidence of this "outward manifestation" is Cassini's testimony, which we found to be vague, contradictory, and generally unpersuasive. We recognize that it is the responsibility of corporate officers and directors to determine the needs of a particular business and that this Court should not second guess the judgment and decisions of management. Magic Mart, Inc. v. Commissioner,51 T.C. 775, 795 (1969); Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 329; *568 Bremerton Sun Publishing Co. v. Commissioner,supra,44 T.C. at 583. However, it is clear that at least before the close of the last taxable year here in issue, September 30, 1976, Cassini had never been an officer, director, or shareholder of petitioner. Moreover, the only evidence of Cassini holding any formal position with petitioner since that time is his signature on petitioner's section 534(c) statement in January of 1980, purportedly as petitioner's President.Granted that closely-held family corporations may operate quite informally, nonetheless, we believe that to be entitled to any deference as a voice of managerment, there must be some showing that the witness is in fact empowered to manage. More importantly, however, we are not bound to accept a witnesses' testimony when it is contradictory, improbable, unreasonable, or questionable. Sullivan v. United States,618 F. 2d 1001 (3d Cir. 1980); Baird v. Commissioner,438 F. 2d 490 (3d Cir. 1970). Accordingly, we attach little weight to Cassini's testimony. There are also other factors indicating that petitioner accumulated its earnings and profits beyond its reasonable *569 business needs. First, petitioner made large loans to related businesses and to shareholders, [10] loans that earned no interest and that were not evidenced by written documents. [11] Second, petitioner maintained a large portfolio of unrelated investments including stocks, tax-exempt bonds, and 30-day commercial paper. [12] These unrelated investment assets constituted between 57 and 61 percent of petitioner's total assets during the years in question. Third, petitioner's liquidity was quite high during all of these years. [13]
*570 Petitioner's explanation for these investments and liquid assets is its assertion that it needed to accumulate its funds to bid upon and perform garbage collection contracts. This did not constitute a "specific, definite, and feasible" plan for using its accumulation. Section 1.537-1(b)(1), Income Tax Regs. Petitioner lacked the required PUC certificate to perform the contract, and it did not bid upon the contract once bids were finally solicited. Petitioner's various explanations for its lack of the certificate and its failure to bid were inconsistent and unbelievable.The record as a whole shows that petitioner was essentially an inactive corporation, had never been engaged in solid waste collection or disposal work, and had no real plans to enter into that line of business. Respondent has carried its burden of proof under section 534(a)(2) of showing that the grounds stated in petitioner's section 534(c) statement did not establish a reasonable business need for the accumulation. Our finding that the accumulation was beyond petitioner's reasonable needs raises a rebuttable presumption that the accumulation was for the proscribed purpose. Section 533(a).To overcome this presumption, *571 petitioner must prove by a preponderance of the evidence that the avoidance of income taxes with respect to its shareholders was not a purpose of its accumulations. Section 533(a); section 1.533-1(b), Income Tax Regs; Nemours Corp. v. Commissioner,325 F. 2d 559, 560 (3d Cir. 1963), affg. 38 T.C. 585, 605 (1962). [14] Petitioner has not sustained its burden of proof. Petitioner paid no dividends to its shareholders at any time before the close of its last taxable year in issue. A corporation's failure to pay dividends, unjustified by its reasonable business needs, is a strong factor indicating the proscribed purpose. Section 1.533-1(a)(2)(iii), Income Tax Regs.; Oyster Shell Products Corp. v. Commissioner,313 F. 2d 449, 454 (2d Cir. 1963), affg. a Memorandum Opinion of this Court; Factories Investment Corp. v. Commissioner,39 T.C. 908, 919 (1963), affd. 328 F. 2d 781, 784 (2d Cir. 1964); *572 Kerr-Cochran, Inc. v. Commissioner,30 T.C. 69, 83-84 (1958). [15] Petitioner's only explanation for its failure to pay dividends is its alleged plan to bid on Newark garbage contracts, which we have previously found is not supported by the record. Petitioner had substantial investments wholly unrelated to its business, which also evidences a tax avoidance motive. Section 1.533-1(a)(2)(ii), Income Tax Regs.; Walker v. Commissioner,362 F. 2d 140, 144-145 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Doug-Long, Inc. v. Commissioner,72 T.C. 158, 181-182 (1979); Kerr-Cochran, Inc. v. Commissioner,supra,30 T.C. at 80-82. Having found that the record does not establish that petitioner accumulated funds to bid on garbage contracts, petitioner's further argument that it maintained these unrelated investments to obtain bid and performance bonds is without factual predicate and unavailing. Looking at the dealings between petitioner and its shareholders, we also find evidence of a purpose to avoid sharehoolder *573 income taxes. Section 1.533-1(a)(2)(i), Income Tax Regs.[16] While the direct loans to shareholders were minimal in amount, this does not contradict a tax avoidance purpose. Cf. Sandy Estate Co. v. Commissioner,43 T.C. 361, 378 (1964); Universal Steel Co. v. Commissioner,5 T.C. 627, 639 (1945). The focus of the regulation is not narrowly limited to shareholder loans; rather, it looks at whether the use of corporate funds, either in the form of expenditures or loans, is for the benefit of the corporation or for the benefit of the shareholders. See also Chicago Stock Yards Co. v. Helvering,318 U.S. 693, 700-701 (1943); Latchis Theaters of Keene, Inc. v. Commissioner,19 T.C. 1054, 1061 (1953), affd. 214 F. 2d 834 (1st Cir. 1954). Here, petitioner made substantial loans to other enterprises owned by the Cassini family. From the record, we cannot say that these loans served any corporate purpose of petitioner's. Generally speaking, "[t]he business of the sister corporation is not the business of the corporation." Chaney & Hope, Inc. v. Commissioner,supra,80 T.C. at 283. See *574 also Factories Investment Corp. v. Commissioner,supra.Rather, such loans benefitted petitioner's shareholders, who are also shareholders in the related corporations. Last, a distribution of petitioner's earnings and profits as dividends would have resulted in large taxes upon at least the principal shareholder, Ann.Her joint returns with Cassini for 1974 and 1975 reported taxable income in both *575 years of over $300,000; consequently, any dividend distributions would have been taxed as ordinary income at a 70 percent marginal rate. Although the effect upon the shareholders is, by itself, insufficient to establish the proscribed purpose, it is evidence of a purpose to avoid shareholder income taxes. Pelton Steel Casting Co. v. Commissioner,supra,28 T.C. at 173. See also Estate of Lucas v. Commissioner,71 T.C. 838, 854 (1979). While, as petitioner argues, it may perhaps be more accurate to look at the tax effect of a dividend rather than merely marginal rates, it is petitioner, not respondent, who must present facts to buttress its argument that the shareholder tax effect of a dividend would have been insubstantial. Petitioner has not done so. Additionally, petitioner argues that any tax savings to the minority shareholder, Joseph, also were minimal. Petitioner presented no evidence of Joseph's income during the years in question or the percentage of his ownership of petitioner; petitioner thus has failed its burden. Moreover, a finding that tax savings to Joseph were minimal would not establish the absence of the proscribed purpose. *576 It is not necessary that the proscribed purpose apply to all shareholders. Trico Products Corp. v. Commissioner,46 B.T.A. 346, 382 (1942), affd. 137 F. 2d 424 (2d Cir. 1943). Petitioner argues that its payment of generous salaries to its high-bracket shareholder-officers, taxable to them as ordinary income, demonstrates that its purpose in accumulating its earnings and profits instead of distributing them as dividends was not tax avoidance with respect to its shareholders. [17] Cf. Herzog Miniature Lamp Works, Inc. v. Commissioner,supra,481 F. 2d at 863. We attach very little weight to this factor. It may well be that the salaries petitioner paid to Ann and Joseph can fairly be characterized as "generous," considering the fact that petitioner was largely an inactive company and Joseph was a law student at Notre Dame. However, the salaries paid to Joseph and Ann were not large when compared to petitioner's undistributed earnings and profits during these years. Moreover, we are not convinced that paying "generous" salaries rebuts shareholder tax avoidance as a purpose of an accumulation. Salaries are deductible by the corporation, *577 and dividends are not. The purpose of the accumulated earnings tax is to compel corporations to pay out their earnings and profits as dividends, thus protecting the two-tiered system of taxation at the corporate and individual level. Even if we accepted these "generous" salaries as a factor weighing against tax avoidance, it is inadequate to overcome the other factors mentioned above which do indicate a tax avoidance purpose. We are satisfied from the record that shareholder tax avoidance was a purpose of petitioner's accumulation. Accordingly, we sustain respondent's imposition of the accumulated earnings tax. Petitioner has not argued that it is eligible for any reduction in the tax through the accumulated earnings tax credit of section 535(c), [18] nor has it otherwise disputed respondent's calculation of the tax, so we shall not consider these questions. Finally, in light of our decision, we need not address respondent's argument that petitioner is a "mere holding or investment company" under section 533(b). *578 Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The parties stipulated to a trade receivable from another related entity, Carteret Land & Development, in the declining amounts of $66,243.18, $55,393.22, and $38,697.06 at the end of each respective fiscal year 1974, 1975, and 1976. However, Schedule L of petitioner's corporate tax returns shows that this asset was a real estate loan as opposed to a trade account receivable.↩
3. Ann did not testify at the trial and Joseph did not testify as to any services he rendered to petitioner during the corporation's fiscal years 1974 through 1976. However, in view of the fact that the corporation had no business activities except equipment rental to related entities, the paucity of any corporate records as to any business activities, and the fact that Joseph was a law student at Notre Dame at the time, the Court did not believe Cassini's testimony about the services Ann and Joseph allegedly rendered to the corporation. If those services were rendered, particularly Joseph's allegedly "throwing garbage, driving a truck and a bulldozer" during the summertime when he was home from Notre Dame, as Cassini testified, any such services were performed for a company other than petitioner because petitioner was not engaged in such activities in those years. The record does not establish that petitioner never engaged in garbabe collection and disposal work.↩
4. These figures differ slightly from those presented by the parties, and result from discrepancies in their figures as presented. The balance sheets (Schedule L) on petitioner's returns for the years in question valued petitioner's common stocks at cost. The balance sheet attached to respondent's answer, to which petitioner admitted in its reply, revalued petitioner's common stocks at their market values, which in all three years were less than cost. See Ivan Allen Company v. United States,422 U.S. 617, 630-633 (1975) and cases cited at 631; Helvering v. National Grocery Co.,304 U.S. 282, 291↩ (1938). When respondent revalued petitioner's common stocks to reflect this decrease in value, he did not make any corresponding adjustment to accounting net income or to retained earnings. As a result, petitioner's overall assets did not balance with its overall liabilities and shareholders' equity. To properly reflect respondent's revaluation of petitioner's common stocks at market, we have accounted for the difference between cost and market values as a charge against retained earnings, representing the unrealized loss. See Wixon, Kell, and Bedford, Accountant's Handbook, 22.16 (5th ed. 1970).
5. By 1977, Katz's largest interest in any of these businesses was just 30 percent.↩
6. Section 534, as in effect during the years in question, provided in pertinent part: (a) General Rule.--In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall-- (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection (b) Notification by Secretary.--Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * * (c) Statement by Taxpayer.↩--Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.
7. We again address this issue in our opinion because through inadvertence no transcript of the oral argument on petitioner's motion was prepared, and with a change in the Court's reporting contractor the tape of the hearing on the motion has been lost or misplaced. ↩
8. See Soros Associates International, Inc. v. Commissioner,↩ T.C. Meno. 1982-79.
9. See Suwannee Lumber Mfg. Co. v. Commissioner,T.C. Memo. 1979-477↩.
10. Although the loans to shareholders alone (Joseph) were minimal ($5,000), the loans to related entities were substantial. The overall loans to both were also substantial. ↩
11. Section 1.537-2(c), Income Tax Regs.; Helvering v. National Grocery Co.,304 U.S. 282, 291-292 and n. 7 (1938); Battelstein v. United States,302 F. Supp. 320 (S.D. Tex. 1969), affd. 442 F. 2d 87 (5th Cir. 1971). See also Kerr-Cochran, Inc. v. Commissioner,T.C. Memo. 1955-90, affd. 253 F. 2d 121↩ (8th Cir. 1958).
12. Section 1.537-2(c)(4), Income Tax Regs.; Helvering v. National Grocery Co.,supra;Ivan Allen Co. v. United States,422 U.S. 617, 628 (1975); Chaney & Hope, Inc. v. Commissioner,80 T.C. 263, 284↩ (1983). 13. Scripps Newspapers v. Commissioner,44 T.C. 453, 467-472 (1965); I.A. Dress Co. v. Commissioner,32 T.C. 93, 102 (1959), affd. 273 F. 2d 543 (2d Cir. 1960), cert. denied 362 U.S. 976↩ (1960).
14. See also A.T. Williams Oil Co. v. Commissioner,T.C. Memo. 1981-461; Alma Piston Co. v. Commissioner,T.C. Memo. 1976-107, affd. 579 F. 2d 1000↩ (6th Cir. 1978).
15. See also Boshwit Brothers, Inc. v. Commissioner,T.C. Memo. 1982-156↩.
16. Sec. 1.533-1(a)(2), Income Tax Regs., provides in pertinent part: (2) The existence or nonexistence of the purpose to avoid income tax with respect to shareholders may be indicated by circumstances other than the conditions specified in section 533. Whether or not such purpose was present depends upon the particular circumstances of each case. All circumstances which might be construed as evidence of the purpose to avoid income tax with respect to shareholders cannot be outlined, but among other things, the following will be considered: (i) Dealings between the corporation and its shareholders, such as withdrawals by the shareholders as personal loans or the expenditure of funds by the corporation for the personal benefit of the shareholders, * * *.↩
17. See Summit Farm, Inc. v. Commissioner,T.C. Memo. 1981-556↩.
18. We note that petitioner's accumulated earnings and profits at the beginning of each year exceeded the minimum section 535(c)(1) credit and that the record does not support a greater amount of the credit for any of petitioner's alleged reasonable business needs.↩